# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CMPC USA, INC.,

    Plaintiff,

    v.

GWSI, INC., M. GERACE
ENTERPRISES, INC., KEVIN BURKE, in
his individual capacity, and MICHAEL
GERACE, in his individual capacity,

    Defendants.

Civil Action No. 2:24-cv-02087-MMB

---

GWSI, INC. & M. GERACE
ENTERPRISES, INC.,

    Plaintiffs,

    v.

CMPC USA, INC., CMPC FOREST
PRODUCTS NA LLC, and CMPC
CELULOSA S.A.,

    Defendants.

Civil Action No. 2:24-cv-02394-MMB

---

## MEMORANDUM OF LAW IN SUPPORT OF CMPC USA, INC. AND CMPC FOREST PRODUCTS NA LLC'S MOTION FOR SANCTIONS, OR, IN THE ALTERNATIVE, TO COMPEL

CMPC USA, Inc. and CMPC Forest Products NA LLC (together, "CMPC"), by and

through their attorneys, respectfully submit this Memorandum of Law in Support of their Motion

for Sanctions, or, in the Alternative to Compel pursuant to the Court's inherent authority and Rules 26(e) and 37(e) of the Federal Rules of Civil Procedure, respectfully showing the Court as follows:

## INTRODUCTION

Though it never should have come to this, GWSI, Inc., M. Gerace Enterprises, Inc., Kevin Burke, and Michael Gerace (together, "GWSI") have left CMPC with no choice but to ask the Court to take the extraordinary step of levying case-ending sanctions against GWSI for its transparent and persistent fraud on this Court. The evidence that GWSI has advanced a fabricated and manipulated version of the parties' agreement and destroyed key evidence of its fraud is extensively detailed below and may be summarized as follows:

1. Back in 2021, GWSI *twice* emailed its fully executed copy of the legitimate version of the parties' agreement to CMPC, once on February 9, 2021 and again in April 2021.

2. In March 2024, in support of its demand for payment in millions of dollars in alleged shortfall penalties, GWSI presented for the first time an altered document with materially different terms.

3. The purported execution date of the altered document was the same as the execution date of the legitimate agreement, evidently because GWSI had re-used a signature page provided by CMPC in the earlier exchange of the legitimate agreement.

4. The metadata associated with the altered version confirms that it was not created until February of *2024*—three years after GWSI supposedly executed it—and only after GWSI had begun demanding shortfall penalties not contemplated under the legitimate agreement.

5. In addition, discovery has revealed an internal GWSI email from January of 2024 with an initial attempt at altering the contract.

6. Discovery has also revealed that the emails from GWSI attaching and providing the legitimate agreement were deleted from GWSI's system at some point, while numerous other emails from the same system exist and have been produced. It is apparent that GWSI not only tried to pass off a fabricated document to CMPC, it also attempted to destroy the evidence of the legitimate agreement.

7. But not only that: despite alleging that it is the controlling version of the parties' agreement, GWSI appears to have failed to produce a copy of its fabricated version of the agreement in this litigation and has otherwise failed to explain why GWSI cannot do so. This suggests that GWSI may have irretrievably destroyed the original file in order to prevent CMPC from analyzing all the associated metadata connected with the fabricated document.

At the same time, GWSI and its counsel have persistently refused to provide any good-faith explanation related to any of these issues, even though GWSI has alleged in pleadings, motions, and discovery responses that its altered version is the underlying contract in this dispute. Moreover, GWSI and its counsel have repeatedly engaged in litigation tactics aimed at delaying CMPC's resolution of these issues on their merits, despite CMPC's initial discovery focusing heavily on this very issue. For example:

1. Despite being informed of the apparent destruction of the key evidence above more than a month ago, GWSI has refused to offer any explanation. GWSI has also refused to provide any explanation for the two manipulated documents.

2. GWSI has refused to admit that GWSI executed the legitimate version of the contract, even though GWSI twice emailed its fully-executed copy of the document to CMPC back in 2021.

3. GWSI refuses to even identify the date on which it contends that the parties met in person to negotiate and execute the altered version of the contract, and it refuses to identify any documents in support of these claims.

4. GWSI has held back any substantial production of its internal emails until October 30, the deadline for the filing of discovery-related motions. Yet, GWSI has refused to jointly agree to modify the deadlines as presently set to permit the parties to continue to confer in good faith.

Only months into discovery, CMPC has uncovered two different fabricated versions of the parties' agreement that is at the core of this case. The metadata confirms that the documents are fabricated, the signatures confirm that the documents are fabricated, and the documentary evidence that forms the larger context confirms that the documents are fabricated. The evidence is also clear that GWSI attempted to cover its tracks by deleting the key emails and attachments that contain the legitimate agreement between the parties, while also apparently deleting the evidence of its fraud.

What makes this all the more incredible is that CMPC informed GWSI and its counsel before this litigation was even filed that the version of the agreement that GWSI was relying on

had been altered and was not the true agreement between the parties. But in reliance on its fabricated version of the agreement, GWSI nevertheless attempted to force CMPC to pay millions of dollars in shortfall penalties that CMPC had not agreed to in its contract, and GWSI then seized CMPC's goods when CMPC refused to pay. In further reliance on its fabricated agreement, GWSI opposed CMPC's Emergency Motion for a Temporary Restraining Order and asserted claims against CMPC seeking $45 million dollars in damages, an amount that was explicitly premised on the fact that GWSI's fabricated version of the agreement contained no termination for convenience clause. And once in litigation, GWSI has done nothing but double down on its fraud throughout the parties' exchange of written discovery and otherwise sought to delay CMPC's resolution of this litigation on the merits.

Given these egregious circumstances, terminating sanctions are appropriate, and the Court should also award CMPC its reasonable attorney's fees and expenses incurred in defending against GWSI's claims. These sanctions are the best—indeed, the only—way to cure GWSI's fraud on this Court and the prejudice caused to CMPC in being forced to expend hundreds of thousands of dollars to defend against GWSI's meritless claims and to uncover GWSI's fraud.

## RELEVANT BACKGROUND

**I.    GWSI has Destroyed Key Evidence of its Bad Faith Litigation Misconduct, including the Metadata Associated with its Fabricated Version of the Parties' Agreements.**

### A. GWSI Fails to Produce Two Key Emails and its Fabricated Version of the Agreement.

Immediately following GWSI's initial document production, counsel for CMPC notified counsel for GWSI in an email dated September 24, 2024 that conspicuously absent from GWSI's document productions were two attachments to two critical email exchanges between the parties. (*See* **Ex. 1** to the Declaration of Andrew C. Stevens ["Stevens Decl."], attached hereto as **Ex. A**.), No other documents were missing from GWSI's document production. And although GWSI had

produced the text of the email communications as parts of other, longer email threads (*see* **Ex.'s 2-3** to Stevens Decl.), GWSI had not produced the emails with their attachments.

Fortunately, CMPC had retained these two email exchanges and, critically, their attachments, which go to the very core of the case. The first email exchange dated February 9, 2021 was produced by CMPC and is attached as **Ex. 4** to Stevens Decl. In this first email exchange, Defendant Michael Gerace (CEO of Defendants GWSI, Inc. and M. Gerace Enterprises, Inc.) had emailed to CMPC a fully executed copy of the February 1, 2021 Warehouse Services Agreement. (**Ex. 4** to Stevens Decl.) This is the document that CMPC has consistently emphasized as the only legitimate version of the fully executed warehouse services agreement between the parties. (*See* CMPC's Amended Complaint [Dkt. No. 40] ¶ 13; *see also* Dkt. No. 40-1.) This first email thus demonstrates that Defendant Gerace executed the February 1, 2021 Warehouse Services Agreement contemporaneously with its negotiation and that he personally provided GWSI's executed copy to CMPC. (**Ex. 4** to Stevens Decl.)

The second email exchange dated March 6, 2024 (more than three years later) was also produced by CMPC and is attached as **Ex. 5** to Stevens Decl. In this second email exchange, Defendant Gerace had emailed to CMPC an altered version of the parties' agreement, one with entirely different terms and conditions, namely: 1) an additional provision in Section 5 imposing minimum monthly storage charges on CMPC; 2) the deletion of CMPC's right to terminate the agreement for convenience in Section 8; and 3) the wholesale replacement of the negotiated terms of Schedule 4 to the agreement with GWSI's un-negotiated, standard-form terms and conditions. (**Ex. 5** to Stevens Decl.)

But not only that: this March 6, 2024 Alternative Version of the Warehouse Services Agreement also features a visibly different signature for GWSI whereas the signature for CMPC is exactly the same:

*Original Signature Page from 2021*          *Altered Signature Page from 2024*

 

(*Compare* **Ex. 4** at p. 7 to Stevens Decl. to **Ex. 5** at p. **7** to Stevens Decl**.**) As explained below, that CMPC's signature is the same is most readily explained by the fact that CMPC had previously provided its signature page to GWSI over email on February 1, 2021 in connection with exchanging the legitimate agreement. (*See* **Ex. 12** to Stevens Decl.)

But to be clear, CMPC had never seen this altered version of the document until March 6, 2024 when GWSI emailed it to CMPC in furtherance of its pre-litigation demand dated March 18, 2024 that CMPC pay millions of dollars in alleged shortfall penalties. (*See* **Ex. 3** to Stevens Decl.; *see also* **Ex. 6** to Stevens Decl.)

It cannot be overemphasized that this fabricated version goes to the heart of GWSI's entire case. This is the version that GWSI relied on in its pre-litigation correspondence with counsel for CMPC, which only further reiterated GWSI's demand for payment of millions of dollars in shortfall penalties. (*See* **Ex. 7** to Stevens Decl.) This is the version that GWSI relied on in support of the hold that it placed on the shipment of CMPC's goods and in support of its opposition to CMPC's Emergency Motion for a Temporary Restraining Order. (*See* Dkt. Nos. 13-14.)

This is also the version that GWSI advanced as the controlling version of the agreement in its initial Complaint (Dkt. No. 1-1 [Case No. 02394] ¶ 26, n.1), in its Amended Complaint (Dkt. No. 41, ¶ 50, n.1), and in its Oppositions to both CMPC USA, Inc.'s Motion to Dismiss and CMPC Forest Products NA LLC's Motion to Dismiss (Dkt. No. 46 at p. 3; Dkt. No. 51 at pp. 4, 14.). Specifically, in its Opposition to CMPC USA, Inc.'s Motion to Dismiss, GWSI relied on its manipulated version to argue that the Court should not dismiss GWSI's quasi-contract claims. (GWSI's Opposition [Dkt. No. 46] at p. 3). In the same way, in GWSI's Opposition to CMPC Forest Products NA LLC's Motion to Dismiss, GWSI argued that dismissal of GWSI's tortious interference claim was inappropriate, because its contract with CMPC USA, Inc. was "not terminable at will" on the basis that GWSI's manipulated version did not include the termination for convenience provision in Section 8. (*See* GWSI's Opposition [Dkt. No. 51] at pp. 4, 14.).

Lastly, GWSI's manipulated version also serves as the basis for GWSI's request for an award of damages against CMPC in the amount of $45 million, for the simple reason that GWSI's fabricated version omits the termination for convenience clause found in Section 8(d) of the actual February 1, 2021 Warehouse Services Agreement. (*See* GWSI's Compl. [Dkt. No. 1-1 in Case No. 02394] ¶ 54); GWSI's Amended Compl. [Dkt. No. 41] ¶¶ 126-127.)

As this demonstrates, GWSI's fabricated version of the agreement has infected every aspect of GWSI's case.

### B. The Parties Meet and Confer on these Spoliation Issues, and GWSI Refuses to Offer any Explanation Whatsoever.

After counsel for CMPC raised this issue on September 24, counsel for the parties had their first good faith meet-and-confer conference on the topic of discovery on October 2. (*See* **Ex. 8** to Stevens Decl.) During this conference, counsel for CMPC raised the issue of the missing attachments. (*See* **Ex. 8** to Stevens Decl.) In response, counsel for GWSI informed counsel for

CMPC that the two documents were not included in GWSI's initial collection of documents and that counsel for GWSI had no explanation as to why. (*See* **Ex. 8** to Stevens Decl.)

Two days after this exchange, in a letter dated October 4, counsel for CMPC then requested that GWSI provide its explanation as to why the documents were not included in GWSI's initial document collection as soon as was practicable. (*See* **Ex. 8** to Stevens Decl.)  Counsel for CMPC further requested that, if counsel for GWSI determines that the documents were deleted before GWSI's initial collection, then GWSI should disclose whether it may recover and then produce the documents with all available metadata. (**Ex. 8** to Stevens Decl.) Counsel for CMPC further requested that GWSI disclose all available details and metadata associated with the date and method with which the documents were deleted and then ultimately recovered and restored. (**Ex. 8** to Stevens Decl.)

GWSI did not respond to this letter, and so on October 14, counsel for CMPC once again wrote to counsel for GWSI by email to request that the parties continue their meet-and-confer conference so as to continue to discuss these issues. (*See* **Ex. 9** to Stevens Decl.) The next day, on October 15, the parties continued their meet-and-confer conference. (*See* **Ex. 10** to Stevens Decl.) During this conference, counsel for GWSI stated that GWSI had not been able to locate the missing documents so as to recover, restore, and produce them. (*See* **Ex. 10** to Stevens Decl.)

As explained in the attached Declaration of Anthony J. Merlino (attached as **Ex. B** hereto), because both Defendant Gerace and Defendant Burke were included on both email exchanges, there likely were multiple deletions of each of the emails from both custodial inboxes in order for both emails to be completely absent from the initial collection. (Merlino Decl. ¶¶ 3-9.) Specifically, it's likely the case that each email was deleted twice, once from the "Inbox Folder" and a second time from the "Deleted Items" or "Trash" folder. (Merlino Decl. ¶¶ 5-9.) Because two emails were

deleted for two custodians, that suggests at least four and likely eight or more intentional acts were undertaken to destroy this critical evidence (four for Defendant Burke and four for Defendant Gerace). (Merlino Decl. ¶ 6.)

During this call, there was also a suggestion by GWSI's counsel that GWSI may have been permitted to engage in a self-collection of its documents. (*See* **Ex. 10** to Stevens Decl.) To date, however, counsel for GWSI has not provided any additional detail to explain whether GWSI did in fact engage in a self-collection of documents in this litigation. Thus, at the conclusion of this October 15 conference, counsel for GWSI stated that he would soon provide CMPC with clarification into the process that GWSI undertook to collect its documents (*e.g*., who conducted the collection and how) and an update on whether GWSI had exhausted its efforts to restore and produce the missing emails and documents that were identified in CMPC's letter dated October 4, 2024. (*See* **Ex. 10** to Stevens Decl.)

On October 17, counsel for CMPC wrote to counsel for GWSI to ask for an update on the status of these efforts. (*See* **Ex. 10** to Stevens Decl.) Counsel for GWSI once again did not respond, and so counsel for CMPC once again wrote to counsel for GWSI on October 22 to ask whether GWSI intended to address these issues. (*See* **Ex. 11** to Stevens Decl.) At that time, counsel for CMPC also asked GWSI to come forward with its good-faith explanation for these spoliation issues, in addition to the issues presented by GWSI's apparent fabrication of evidence (summarized separately below). (*See* **Ex. 11** to Stevens Decl.)

In response, counsel for GWSI stated that it was continuing to "investigate whether [the missing emails and documents] can be located and will follow up." (**Ex. 23** to Stevens Decl.) To date, however, counsel for GWSI has not offered any substantive explanation for how and why these documents were destroyed. And rather than address these serious issues, counsel for GWSI

on October 25 requested that the parties meet and confer that same day to discuss *only* GWSI's requests regarding additional custodians, search terms, and certain of CMPC's objections to GWSI's Requests for Production (*See* **Ex. 23** to Stevens Decl.)

The fact that GWSI appears to have yet been unable to separately locate the deleted attachments themselves (most notably, GWSI's original copy of the Alternative Version of the Warehouse Services Agreement) further suggests that these specific files were also deleted multiple times off of GWSI's local computers or other networks. (Merlino Decl. ¶¶ 10-11.) For example, assuming that GWSI's original copy of the Alternative Version of the Warehouse Services Agreement was saved locally on just one computer, for GWSI to be unable to locate and produce that document suggests that it was deleted once from the desktop and a second time from the "Recycle Bin." (Merlino Decl. ¶ 11.) It is also possible that the original file is stored in the memory (or "scan to file" folder or "document server") of the multifunction printer that was used to create the Alternative Version of the Warehouse Services Agreement. (Merlino Decl. ¶ 12.) Therefore, assuming that GWSI cannot restore the original file from the memory of this multifunction printer, it is likely that the original file was removed from the multifunction printer's memory either by an automatic deletion policy or manually. (Merlino Decl. ¶ 12.)

## II. Meanwhile, CMPC Uncovers Multiple Pieces of Evidence which Confirm that GWSI Fabricated the Document at the Heart of its Case.

### A. The Evidence that GWSI Fabricated the 2024 Alternative Version of the Warehouse Services Agreement.

The evidence that GWSI fabricated the 2024 Alternative Version of the Warehouse Services Agreement consists of (1) direct documentary evidence and (2) metadata from the copy of the fabricated version that Defendant Gerace sent to CMPC on March 6, 2024 by email.

First, the documentary evidence shows that, after months of negotiation, on February 1, 2021, Joaquin Rojas (former Managing Director with CMPC) emailed GWSI a signed version of

the February 1, 2021 Warehouse Services Agreement bearing *only* his signature, which was dated February 1, 2021. This can be seen below:





(**Ex. 12** to Stevens Decl.)

On February 9, 2021, Michael Gerace of GWSI then sent the fully executed counter-signed version of the February 1, 2021 Warehouse Services Agreement back to CMPC, also by email, and also with his signature dated February 1, 2021:





(**Ex. 4** to Stevens Decl.)

A few months later on April 29, 2021, Defendant Kevin Burke of GWSI then sent the *exact same* fully executed counter-signed version of the February 1, 2021 Warehouse Services Agreement to CMPC for a *second* time:

| | |
|---|---|
| **Date:** | Thu, 29 Apr 2021 12:07:12 PM -0400 |
| **Sent:** | Thu, 29 Apr 2021 12:07:03 PM -0400 |
| **Subject:** | RE: CMPC Contracts |
| **From:** | Kevin Burke <Kburke@mgeraceinc.com> |
| **To:** | Joaquin Rojas Herrera <joaquin.rojas@cmpc.cl>; Mike Gerace <mike@mgeraceinc.com>; |
| **Attachments:** | image001.png; image002.png; image003.png; CMPC Signed Warehouse Agreement.pdf |

Hi Jaoquin,
Signed agreement is attached.
Let me know if you need anything else.
Thanks
Kevin



(**Ex. 13** to Stevens Decl.)

But three years later, the CMPC personnel involved with the negotiation and execution of the February 1, 2021 Warehouse Services Agreement are no longer employed with CMPC in 2024,

including the Managing Director of CMPC that signed the agreement on its behalf. (*See* CMPC's Initial Disclosures attached as **Ex. 14** to Stevens Decl.) And because CMPC had sent to GWSI by email a version of the agreement that included a signature page with *only* CMPC's signature, GWSI would have been able to easily access this exact same signature page in the future for its misuse. (**Ex. 12** to Stevens Decl.) So, in dealing with CMPC's *new* Managing Director (Ms. Alejandra Pavon) in March 2024, GWSI produced for the *first time* the Alternative Version of the Warehouse Services Agreement, complete with different terms and conditions and a different signature for GWSI (but an identical signature for CMPC):



(**Ex. 5** to Stevens Decl.)

Yet, CMPC need not rely solely on this documentary evidence to show that GWSI fabricated this March 6, 2024 version. Instead, because Defendant Michael Gerace of GWSI emailed the Alternative Version of the Warehouse Services Agreement to CMPC on March 6, 2024 (*see* **Ex. 5** to Stevens Decl.), CMPC has been able to analyze certain metadata associated

with the document, notwithstanding the fact that GWSI appears to have failed to produce it in this litigation.

In doing so, CMPC employed the services of a forensic e-discovery expert, Mr. Tony Merlino. Mr. Merlino has prepared an expert report, which was served on GWSI on October 1, 2024. (*See* **Ex. 1** Merlino Decl.) As explained there, upon examination of the available metadata associated with the March 6, 2024 Alternative Warehouse Services Agreement, Mr. Merlino was able to ascertain the following, which provides further evidence that GWSI fabricated the document:

1. Despite bearing a signature dated February 1, 2021, the Alternative Version of the Warehouse Services Agreement was actually created on February 20, ***2024*** through a multi-function printer, meaning that it was scanned from a paper copy into PDF format using a multi-function printer/scanner *three* years after it was purportedly signed by GWSI. This metadata is also consistent with the file name of the PDF itself, which includes this exact date: "20240220," (as can be seen in the email excerpted above). (**Ex. 1** to Merlino Decl. at pp. 9-11; Merlino Decl. ¶ 28.)

2. The XMP metadata timestamps associated with the March 6, 2024 Alternative Version of the Warehouse Services Agreement do not reflect the prior executed and circulated date and time of the 2021 document. (**Ex. 1** to Merlino Decl. at p. 10; Merlino Decl. ¶ 28.)

3. The MD5 Hash Value for the March 6, 2024 Alternative Version of the Warehouse Services Agreement does not match the values of any other version of the contract, meaning that it is a brand new document. (**Ex. 1** to Merlino Decl. at p. 9.; Merlino Decl. ¶ 28)

Therefore, based on these data points, Mr. Merlino is prepared to testify to his opinion that the Alternative Version of the Warehouse Services Agreement is a manipulated and altered version of the February 1, 2021 Warehouse Services Agreement. (**Ex. 1** to Merlino Decl. at p. 11.)

### B. The Evidence that GWSI Engaged in an Earlier Attempt at Manipulating the Parties' Agreement.

But the evidence of GWSI's fabrication of evidence does not end there. Instead, in addition to all the evidence above, CMPC was also able to identify an earlier-in-time altered version of the agreement, which suggests that GWSI created at least two manipulated versions of the parties'

agreement in the run-up to GWSI's demand for payment in millions of dollars in alleged shortfall penalties, which GWSI made for the first time in 2024. CMPC raised this issue with GWSI in a separate letter dated October 10, shortly after GWSI produced the document on October 2. (**Ex. 15** to Stevens Decl.)

Specifically, on October 2, 2024, GWSI produced a January 9, 2024 email from Phil Sinatra to Defendant Gerace (**Ex. 16** to Stevens Decl.) in which Mr. Sinatra purported to attach a draft version of the Warehouse Services Agreement (file name "Warehouse Services Agreement (v3) Rev.01052021.pdf"):

| Message | |
|---|---|
| **From**: | Phil Sinatra [phil@mgeraceinc.com] |
| **Sent**: | 1/9/2024 2:03:09 PM |
| **To**: | Mike Gerace [mike@mgeraceinc.com] |
| **Subject**: | CMPC Warehouse Services Agreement |
| **Attachments**: | Warehouse Service Agreement (v3) Rev.01052021.pdf; Untitled attachment 00004.htm |

The produced version of Mr. Sinatra's January 9, 2024 email does not contain any text in the body of the message. And although the attachment to Mr. Sinatra's email (**Ex. 17** to Stevens Decl.) on the face of its file name describes it as the draft version three of the Warehouse Services Agreement sent by CMPC to GWSI on January 18, 2021, it is clear that it is not.

Instead, several readily apparent alterations were made to the original version of this iteration of the document, which was sent by email from CMPC to GWSI on January 18, 2021. (*See* **Ex. 18** to Stevens Decl.). First, like the other fabricated version, the document attached to Mr. Sinatra's email conspicuously omits the termination for convenience provision included in Section 8(d) of the original version of the document sent by CMPC on January 18, 2021. (*Compare* **Ex. 17** at to Stevens Decl. at p. 4 to **Ex. 18** to Stevens Decl. at p. 5.)

Second, the document attached to Mr. Sinatra's email features the highlighting of certain text that was not included in the original version of the document. (*Compare* **Ex. 17** at to Stevens Decl. at pp. 2-4 to **Ex. 18** to Stevens Decl. at pp. 3-5.) This suggests that Phil Sinatra's altered

version may have originated from a highlighted version of the agreement that Defendant Burke of GWSI sent back to CMPC on January 18, 2021, which contained the same highlighted text and the same signature from CMPC dated January 18, 2021. (*See* **Ex. 19** to Stevens Decl.)

Third, like the other fabricated version, the document attached to Mr. Sinatra's email appends GWSI's standard form terms and conditions as Schedule 4 to the document—which were not the terms and conditions appended as Schedule 4 to the original version of the document from CMPC back in 2021. (*Compare* **Ex. 17** at to Stevens Decl. at pp. 12-18 to **Ex. 18** to Stevens Decl. at pp. 13-19.)

Fourth, and perhaps most strikingly, however, the signature page in the attachment to Mr. Sinatra's email features a distorted image of CMPC's signature on the original version of the draft document, as can be seen below:

*Image of CMPC's Signature in Attachment to Mr. Sinatra's January 9, 2024 Email*

*Image of CMPC's Signature in Original Version Sent by CMPC on January 18, 2021*





(**Ex. 17** to Stevens Decl. at p. 6)

(**Ex. 18** to Stevens Decl. at p. 7)

As with the other fabricated document, the metadata associated with the attachment to Mr. Sinatra's January 9, 2024 email is consistent with fabrication. First and foremost, the available metadata shows that this altered document was created on January 9, 2024 at 11:09 am, just a few hours before Mr. Sinatra sent the attachment to Defendant Gerace at 2:03 pm. (Merlino Decl. ¶¶ 31-32; *see also* **Ex. 2** thereto.)

The MD5 Hash Value associated with the attachment to Mr. Sinatra's January 9, 2024 email (D19DBD56890DE0DA049BA546A96A5EBC) is also unique as compared to any other prior version of the warehouse services agreement exchanged between the parties,[1] meaning that the attachment to Mr. Sinatra's email is a new document. (Merlino Decl. ¶ 33.) The metadata also shows the "Source File Name" associated with the altered document to be "Warehouse Services Agreement (v3) Rev.01052021.pdf," which is consistent with the analysis above suggesting that the attachment to Mr. Sinatra's email is an altered version of the original document bearing that file name. (Merlino Decl. ¶ 35.)

Based on these findings, CMPC requested in its October 10 letter that GWSI produce the native versions of each version of the warehouse services agreement in its possession, custody, and control, including the original of GWSI's 2024 Alternative Version of the Warehouse Services Agreement, which GWSI has apparently destroyed. (*See* **Ex. 15** to Stevens Decl.) This would allow CMPC to analyze all available metadata associated with these original files, including system level metadata and applicable level data that would provide extensive, additional information concerning the date and time that each native file was accessed and what actions were taken with respect to the document at that time. (Merlino Decl. ¶¶ 13-23.)

Despite CMPC's request, GWSI to date has offered no good-faith explanation for this second, earlier-in-time altered version of the parties' agreement, and GWSI has not produced the native versions of each iteration of the agreement either.

---

[1] For example, the MD5 Hash Value of the original version of the document sent by CMPC to GWSI on January 18, 2021 is 0C848A474B60D5D54A59E80AA5C41788. (Merlino Decl. ¶ 34.)

**III.**   **While Engaged in this Fraud of Destroying and Fabricating Evidence, GWSI Repeatedly Refuses to Explain the Origins of the Alternative Version of the Agreement.**

Rather than come forward with facts and evidence to support its allegations, from the outset of this litigation GWSI has refused to explain in any sufficient detail the origins of the Alternative Version of the Warehouse Services Agreement. For example, in its initial Complaint, GWSI offered no detail or explanation whatsoever. (*See* GWSI's Compl. [Dkt. No. 1-1 in Case No. 02394] ¶ 26, n.1.) Only following CMPC's Motion for a More Definite Statement on that issue (Dkt. No. 35 at pp. 14-17), did GWSI amend its Complaint to allege that Defendant Gerace of GWSI (but *not* CMPC) executed the Alternative Version at an in-person meeting at an unspecified date and time in Charleston, South Carolina in the month of February 2021. (*See* Dkt. No. 41 ¶¶ 53-54.) It should be noted that this position conflicts with the position that GWSI took in its April 26, 2024 letter which stated that *both* CMPC and GWSI executed this alternative version in person in Charleston, South Carolina. (**Ex. 7** to Stevens Decl.) The likely explanation for this deviation is GWSI's recognition that the signature for CMPC on the manipulated version is the exact same as the version that CMPC sent by email back in 2021. (**Ex. 12** to Stevens Decl.)

GWSI's obfuscations then continued in discovery. For example, in its discovery responses, GWSI took the position that Defendant Gerace of GWSI sent his signed version of the February 1, 2021 Warehouse Services Agreement to CMPC in April 2021 "in error." (*See e.g.*, GWSI's Response to CMPC's Request for Admission No. 35 [attached as **Ex. 20** to Stevens Decl.].) GWSI has also repeatedly characterized Defendant Gerace's counter-signed version of the fully executed February 1, 2021 Warehouse Services Agreement as "an incorrect' and non-final version. (*See, e.g.*, GWSI's Responses to CMPC's Interrogatory Nos. 1, 7 [**Ex. 21** to Stevens Decl.].)

Yet, in response to CMPC's interrogatories directly on point, GWSI also flatly refused to provide any additional substantive information to corroborate its allegation that CMPC and GWSI

negotiated and executed a second version of the agreement. (*See, e.g.*, GWSI's Response to CMPC's Interrogatory Nos. 1, 7 [**Ex. 21** to Stevens Decl.].) Nor has GWSI provided any explanation in support of its suggestion that Defendant Gerace sent his counter-signed copy of the fully executed February 1, 2021 Warehouse Services Agreement to CMPC "in error" in April 2021. (**Ex. 20** to Stevens Decl.)

In fact, in its initial response to Request for Admission No. 33 asking GWSI to admit that GWSI executed the February 1, 2021 Warehouse Services Agreement, GWSI took the position that GWSI had not found "any evidence that GWSI contemporaneously executed the February 1, 2021 Warehouse Servies Agreement and emailed it back to back to CMPC." (*See* GWSI's Response to CMPC's Request for Admission No. 33 [attached as **Ex. 20** to Stevens Decl.].) Needless to say, that response is contradicted by the emails exchanged between the parties in February of 2021. (**Ex. 4** to Stevens Decl.)

Despite CMPC raising these issues in a letter as early as August 16, 2024 (*see* **Ex. 22** to Stevens Decl.), GWSI has not yet supplemented its responses to CMPC's Interrogatories or its responses to CMPC's Requests for Admission.[2]

## IV.  GWSI Attempts to Delay Resolution of These Issues Until After Expiration of the October 30 Deadline for the Filing of Discovery-Related Motions.

Although CMPC raised the issue of GWSI's apparent destruction of key evidence on September 24 (**Ex. 1** to Stevens Decl.), GWSI has not yet recovered, restored, and produced the destroyed documents, including its original native file of the 2024 Alternative Version of the

---

[2] On October 22, GWSI stated that it would agree to supplement its responses to CMPC's Interrogatory Nos. 5, 6, 11, 20, 21, 22, and 24 but not Interrogatory Nos. 1, 7 or the remainder discussed below. (*See* **Ex. 27** to Stevens Decl.)

Warehouse Service Agreement. Nor has GWSI produced in response to CMPC's October 10 request the native versions of the other iterations of the warehouse services agreement.

And although CMPC suggested that the parties jointly agree to extend the current October 30 deadline to file discovery-related motions so that the parties could continue to confer on these issues, GWSI refused. (Stevens Decl. ¶ 25).[3] At the same time, GWSI has purposefully held back its first substantial production of its internal emails until October 30, the deadline for the filing of discovery-related motions. (**Ex. 24** Stevens Decl.) The purpose of this delay is clear: GWSI and its counsel have purposefully delayed the resolution of these critical issues in the hopes that, following the expiration of the October 30 deadline, it may continue to rely on its fabricated evidence while avoiding the production of the original versions of the documents, thereby preventing CMPC from analyzing all available metadata associated with those files.

## ARGUMENT AND CITATION TO AUTHORITIES

I. **The Court Should Sanction GWSI for Spoliation under the Court's Inherent Authority and under Fed. R. Civ. P. 37(e).**

Spoliation is defined as "[t]he intentional destruction, mutilation, alteration, or concealment of evidence." *See Malone v. Weiss*, No. CV 17-1694, 2018 WL 3656482, at *6 (E.D. Pa. Aug. 2, 2018) (quoting *Black's Law Dictionary* 1531 (9th ed. 2009)). Evidence of spoliation may give rise to sanctions which include dismissal of a claim, suppression of evidence, an adverse inference, fines, and attorneys' fees and costs. *See id.* (citing *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp.2d 332, 335 (D.N.J. 2004) (collecting cases)). The burden of proof to demonstrate spoliation lies with the party asserting that spoliation has taken place. *See id.* (citing *Culler v. Shinseki*, No. CV 3:09-0305, 2011 WL 3795009, at *3 (M.D. Pa. Aug. 26, 2011)).

---

[3] On this basis, counsel for CMPC certifies that the parties, after reasonable good-faith efforts, have been unable to resolve these disputes in accordance with Local Rule 26.1(f) and Section C.1 of the Court's Pretrial and Trial Procedures – Civil Cases.

As an initial matter, courts have come to different conclusions as to whether sanctions for the spoliation of ESI may be imposed based on a court's inherent power or whether the courts must apply the framework set forth in Fed. R. Civ. P. 37(e). *See, e.g., Mazur v. Sw. Veterans Ctr.*, No. CV 17-826, 2019 WL 3711998, at *6 (W.D. Pa. Aug. 7, 2019).[4]

Here, however, because this case involves "the intentional manipulation of emails and contracts in order to gain an advantage in litigation," it is appropriate for the Court to exercise its inherent power. *See Malone*, 2018 WL 3656482, at *7 (levying sanctions pursuant to the court's inherent power); *see also Amerisource Corp. v. Rx USA Int'l Inc.*, No. 02-CV-2514 (JMA), 2010 WL 2730748, at *5 n.3 (E.D.N.Y. July 6, 2010), *aff'd sub nom., New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc.*, 432 F. App'x 25 (2d Cir. 2011) (finding it more appropriate to impose sanctions under the Court's inherent power because "the misconduct at issue here is broader than a Rule 37 violation."); *Scalia v. Valley Hotel, Inc.*, No. 4:17-CV-00113, 2020 WL 263012, at *3 (M.D. Pa. Jan. 17, 2020) ("Pursuant to their inherent authority, Courts may impose sanctions for spoliation.").

---

[4] In *Chambers v. NASCO, Inc.*, the U.S. Supreme Court held that federal courts have the inherent power to "fashion an appropriate sanction for conduct which abuses the judicial process," 501 U.S. 32, 45 (1991) but cautioned that the power to sanction a party is limited to those cases where the party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons...." *Id.* Fed. R. Civ. P. 37 on the other hand provides that "[i]f electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court ... only upon finding the party acted with the intent to deprive another party of the information's use in the litigation may ... dismiss the action or enter a default judgment." Fed. R. Civ. P. 37(e). As this Court has previously explained: "The Rule, by its very terms, only applies when a party has 'failed to take reasonable steps to preserve' electronically stored information and 'it cannot be restored.'" *See Malone*, 2018 WL 3656482, at *7.

### A. Under the Court's Inherent Authority, Because Spoliation has Occurred, the Court Should Determine the Appropriate Sanction.

The Court's spoliation analysis under its inherent power entails a two-part inquiry. *See Malone*, 2018 WL 3656482, at *7 (citing *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). First, the Court should determine whether spoliation occurred. *See id.* Second, the Court should determine the appropriate sanction. *See id*.

The first question can be decided easily enough. "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and the duty to preserve the evidence was reasonably foreseeable to the party." *See id.* (quoting *Bull*, 665 F.3d at 73.) Here, "consistent with the plethora of cases finding spoliation where a party intentionally alters or deletes evidence," the Court should find that spoliation of evidence has occurred in this case based on GWSI's apparent destruction of critical evidence and its repeated reliance on fabricated evidence that goes to the heart of GWSI's claims. *See Malone*, 2018 WL 3656482, at *7 (citing *Mosaid Techs*, 348 F. Supp. 2d at 336 (collecting cases)).

That the deleted emails and documents are highly relevant is clear. First, the February 9, 2021 email and attachment shows that GWSI executed the February 1, 2021 Warehouse Services Agreement contemporaneously with its creation and then returned their fully-executed copy to CMPC without issue. (**Ex. 4** to Stevens Decl.) The February 9, 2021 email exchange also demonstrates that GWSI's *second* email providing the exact same version of the agreement to CMPC later in April 2021 was not a mistake—contrary to what GWSI (and its counsel) have repeatedly contended. (*See* **Ex. 13** to Stevens Decl.)

Obviously, GWSI's altered 2024 Alternative Version of the Warehouse Services Agreement is highly relevant given that it is the version of the agreement that GWSI has repeatedly

asserted to be the "final" and "binding" agreement between the parties. (*See* GWSI's Am. Compl. [Dkt. No. 41] ¶¶ 50-54, 59.)

It is also clear that GWSI has altered and fabricated evidence in this case. The available metadata confirms that GWSI's Alternative Version was not created until February of 2024, when it was scanned into PDF through a multifunction printer (Merlino Dec. ¶¶ 26-27), and it inexplicably contains the exact same signature that CMPC provided to GWSI over email in February 2021 but a visibly different signature from GWSI. (*Compare* **Ex. 12** to Stevens Decl. at p. 9 to **Ex. 5** to Stevens Decl. at p. 7.) The terms are altered to favor GWSI, and GWSI can cite to no documentary evidence to affirmatively suggest that the parties did *in fact* meet in Charleston in February 2021 to negotiate a new version of the agreement.

This is also consistent with what can only be described as GWSI's *first* attempt at altering the agreement. As noted above, on January 9, 2024, Phil Sinatra of GWSI emailed to Defendant Gerace an altered version of an earlier draft of the agreement (**Ex.'s 17-18** to Stevens Decl.) That altered version had many of the same alterations later found in the 2024 Alternative Version, and it had also distorted the image of CMPC's signature on an earlier, non-final version of the document. (*Compare* **Ex. 17** to Stevens Decl. at p. 6 to **Ex. 18** to Stevens Decl. at p. 7.)[5]

Given GWSI's clear destruction and alteration of the key evidence in this case, the only question that remains is the appropriate sanction. In order to determine the appropriate sanction when a party spoliates or fabricates evidence, courts in the Third Circuit consider three factors: "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of

---

[5] It shouldn't be missed that the fact that Phil Sinatra emailed this altered version of the document to Defendant Gerace earlier this year only further undercuts GWSI's unsupported claim that the 2024 Alternative Version had been executed at an in-person meeting in February 2021. If that were the case, then why was Phil Sinatra emailing Defendant Gerace a different, unsigned version of the agreement in January of 2024?

prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *See Malone*, 2018 WL 3656482, at *8 (quoting *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994)).

As explained below, the only appropriate sanction for GWSI's fraud on the Court is the dismissal of GWSI's Claims and the entry of a default judgment against it.

### B. The Only Appropriate Sanction for GWSI's Fraud on the Court is the Dismissal of GWSI's Claims and the Entry of a Default Judgment Against it.

Fraud on the court occurs where it can be demonstrated, clearly and convincingly:

> That a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*See Goldrich v. City of Jersey City*, No. CV 15-885 (SDW)(LDW), 2018 WL 4492931, at *11 (D.N.J. July 25, 2018), *report and recommendation adopted as modified*, No. CV 15-885 (SDW)(LDW), 2018 WL 4489674 (D.N.J. Sept. 19, 2018) (citation and quotation omitted). To put it bluntly, GWSI's scheme of fabricating fraudulent versions of the parties' contract, destroying the underlying evidence of its fraud to cover it up, and then doubling down on its fraud through pleadings, briefs, and written discovery is a fraud on this Court. *See id.*; *see also Derzack v. Cnty. of Allegheny, Pa.*, 173 F.R.D. 400, 412–13 (W.D. Pa. 1996), *aff'd sub nom. Derzack v. Cnty. Allegheny Child. & Youth Servs.*, 118 F.3d 1575 (3d Cir. 1997) (finding litigants committed a fraud on the court; collecting cases).

The case law demonstrates that dismissal is the only appropriate sanction under these circumstances. *See Brown v. Adams*, No. CV 19-638, 2020 WL 8249570, at *11 (W.D. Pa. June 11, 2020), *report and recommendation adopted*, No. CV 19-638, 2021 WL 210490 (W.D. Pa. Jan. 21, 2021) ("The Court's ability to dismiss an entire action due to fraud upon the Court may arise

under various procedural rules, or under the inherent power of the Court.") (citation and quotation omitted)). Indeed, it is well-settled that the Court "may dismiss a suit outright in response to litigation abuses." *See Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 73 n.10 (3d Cir. 1995)); *see also Perna v. Elec. Data Sys., Corp.*, 916 F. Supp. 388, 397 (D.N.J. 1995) ("[T]he court may use its inherent power to prevent the perpetration of a fraud upon the court.").

To begin, courts in the Third Circuit refer to a six-factor balancing test for determining whether to dismiss a claim as sanction, as outlined in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863 (3d Cir. 1984). Those factors are:

> (1) extent of the party's personal responsibility;
>
> (2) prejudice to the adversary;
>
> (3) a history of dilatoriness;
>
> (4) whether the conduct of the party or the attorney was willful or in bad faith;
>
> (5) effectiveness of sanctions other than dismissal; and
>
> (6) the meritoriousness of the claim or defense.

*Poulis*, 747 F.2d at 868.

In balancing these factors, "no single *Poulis* factor is dispositive," and "[e]ach factor need not be satisfied for the trial court to dismiss a claim." *See Ware v. Rodale Press, Inc.*, 322 F.3d 218, 221-22 (3d Cir. 2003); *Mindek v. Rigatti*, 964 F.2d 1369, 1373 (3d Cir. 1992). Dismissal may therefore be appropriate "so long as the ... court carefully considers and weighs the several factors and reasonably exercises his or her discretion in finding the scales tip toward dismissal." *See Derzack.*, 173 F.R.D. at 414.

Here, as analyzed below, each of the *Poulis* factors weigh in favor of dismissing GWSI's claims and entering a default judgment against it.

*First*, Defendants GWSI, Inc., M. Gerace Enterprises, Inc., Michael Gerace, and Kevin Burke are personally responsible for this fraud on the Court. *See Brown*, 2020 WL 8249570, at *11, *report and recommendation adopted*, 2021 WL 210490. Defendants Gerace and Burke were both personally involved in presenting the fabricated document and advancing it in support of its demands. (**Ex.'s 5-6** to Stevens Decl.)

*Second*, the prejudice to CMPC has been extreme. It is no exaggeration to say that GWSI's fabricated evidence is the entire basis for GWSI's claims and has infected every stage of these proceedings. (*See supra* pp. 6-7.) To say that CMPC has suffered "severe prejudice" in the sense that GWSI's fabricated evidence "materially assisted" GWSI's claims against CMPC is a gross understatement. *See Malone*, 2018 WL 3656482, at *8.

CMPC has also suffered clear and extreme prejudice due the fact that it was "required to invest time and resources to determine, and dispute, the veracity of Plaintiff's fabricated documents." *See Brown*, 2020 WL 8249570, at *11, *report and recommendation adopted*, 2021 WL 210490. On this point, CMPC has been forced to expend hundreds of thousands of dollars to litigate a case that never should have been brought in the first place, despite transparently raising the issue of GWSI's apparent fabrication in its first pre-litigation correspondence even before the case was filed. (**Ex. 25** to Stevens Decl.)

And because GWSI refused to admit to its fraud, CMPC was forced to employ a forensic e-discovery expert and to incur immense amounts of legal fees to uncover GWSI's fraud during the course of discovery, only to then be forced to file this substantial motion for sanctions because GWSI once again refused to admit to its wrongdoing. Unsurprisingly, courts regularly find that these "types of costs and delays are sufficient to justify sanctions." *See Curtis T. Bedwell & Sons v. Int'l Fidelity Ins. Co*., 843 F.2d 683, 693-94 (3d Cir. 1988).

But the prejudice to CMPC is not all that the Court should consider. Rather, "[w]here fraud on the court is the underlying misconduct upon which the district court is considering dismissal, the *Poulis* 'prejudice' prong encompasses not only the prejudice to the litigants but also the impact on the judicial system and the threat to the integrity of the courts...." *Wesley v. Scharff*, No. 09-285J, 2011 WL 5878053, at *3 (W.D. Pa. Sept. 26, 2011). As the United States Supreme Court has noted, "tampering with the administration of justice in the matter indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *Id.* (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire* Co., 322 U.S. 238, 246, 64 S.Ct. 997, 88 L.Ed. 1250 (1944) (subsequent history omitted). In other words, GWSI has committed "a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society." *See id.* GWSI's actions thus clearly "threaten to undermine the public's faith in courts and the discovery process." *See Malone*, 2018 WL 3656482, at *8.

The prejudice factor therefore weighs *decisively* in favor of dismissal.

On the *third* and *fourth* factors, it is clear that GWSI and its counsel have engaged in litigation misconduct aimed at impeding CMPC's ability to prove GWSI's fraud and otherwise delaying the ultimate resolution of these issues. (*See supra* pp. 18-20.) Like other litigants that have been sanctioned in the Third Circuit, GWSI and its counsel have "engaged in further litigation abuse by filing baseless [pleadings and briefs]" and "doubling down on [GWSI's] falsehoods." *See Brown,* 2020 WL 8249570, at *11*, report and recommendation adopted,* 2021 WL 210490*.* GWSI's conduct thus reveals a pattern of stonewalling, "bad faith and lack of candor, and of

seeking solely to 'forestall [GWSI's] day of reckoning.'" *See id.* (quoting *Derzack*, 173 F.R.D. at 416). These factors therefore also strongly favor dismissal.

*Fifth*, the case law shows that no alternative sanction other than dismissal is enough here. As this court has recognized: "In the fraud context, where a party resorts to fabricated evidence in order to bolster their claims, monetary costs and fines would 'be conveying a message to litigants that money could cure one's improper acts.'" *See Malone*, 2018 WL 3656482, at *9 (quoting *Perna*, 916 F. Supp. at 400). For this simple reason, courts have recognized that monetary costs and fines are "not enough," especially considering that there "there is no guarantee that [GWSI] would pay." *See id.* (citing *Derzack*, 173 F.R.D. at 417).

At the same time, "[m]erely excluding the evidence is insufficient, because the evidence is fabricated and not properly before the Court in the first place." *See Brown*, 2020 WL 8249570, at *11, *report and recommendation adopted*, 2021 WL 210490. For this reason, "simply excluding [GWSI's] false evidence does not sufficiently deter such misconduct, and it 'would send a message that the court remains open to claims even by those who seek justice by fraudulent means.'" *See id.* (quoting *Boulware v. Overmyer*, No. CV 15-300, 2017 WL 6039745, at *5 (W.D. Pa. Dec. 6, 2017).

Therefore, as in *Malone*, the case law shows that the only available remedy which is "proportional to the deleterious conduct involved in this matter is outright dismissal of [GWSI's] claims." *See* 2018 WL 3656482, at *9. Indeed, the case law is clear: a party's "resort to fabricated evidence justifies denial of all relief to that party." *See id.* (citing *Hazel-Atlas Glass Co.*, 322 U.S. 238 (1944)). And the Third Circuit has made it abundantly clear in multiple cases that this Court has the inherent authority to dismiss claims asserted by litigants who have fabricated or altered evidence. *See, e.g. Republic of Philippines*, 43 F.3d at 73 ("[W]e have noted that a district court

may dismiss a suit outright in response to litigation abuses."); *Capogrosso v. 30 River Court E. Urban Renewal Co*., 482 F. App'x 677, 682 (3d Cir. 2012) ("In the event that a party undertakes spoilage, the sanctions available to a court include dismissal of the relevant claim ..."); *Amfosakyi v. Frito Lay, Inc.*, 496 F. App'x 218, 225 (3d Cir. 2012) (affirming dismissal of claim as a sanction for spoilage).

In applying this case law, the Court should accordingly exercise its inherent authority and sanction GWSI for its spoliation and fabrication of evidence by dismissing GWSI's claims and entering default judgment against it. The Court should also award CMPC its reasonable attorney's fees and expenses associated with defending against GWSI's baseless claims, including its reasonable attorney's fees and expenses associated with uncovering GWSI's fraud and bringing this motion for sanctions.[6] *See Int'l Fin. Co., LLC v. Jabali-Jeter*, No. 18-CV-2120, 2019 WL 2268961, at \*17 (E.D. Pa. May 28, 2019) (awarding fees and costs); *Peronace v. City of Philadelphia*, No. CV 23-3943-KSM, 2024 WL 1660543, at \*7 (E.D. Pa. Apr. 16, 2024) (same).

### C. The Court Should also Sanction GWSI under Fed. R. Civ. P. 37(e).

Were the Court to analyze GWSI's spoliation under Fed. R. Civ. P. 37(e), the case law under this rule likewise demonstrates that Dismissal is appropriate. "Rule 37(e) provides a general framework for determining the appropriate sanction for spoliation of ESI," which focuses on whether the opposing party is prejudiced by the loss of the information and whether the spoliating party "acted with intent to deprive another party of the information's use in the litigation." *See Peronace*, 2024 WL 1660543, at \*6–7.

Specifically:

(1) upon finding prejudice to another party from loss of the information, [the court] may order measures no greater than necessary to cure the prejudice; or

---

[6] CMPC respectfully requests that the Court permit CMPC to submit an application for an award of its fees and costs within 14 days of the Court's ruling on this motion for sanctions.

> (2) only upon a finding that the party acted with intent to deprive another party of the information's use in the litigation [the court] may:
>
>> (A) presume that the lost information was unfavorable to the party;
>>
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>
>> (C) dismiss the action or enter default judgment.

Fed. R. Civ. P. 37(e).

In addition to the Rule 37(e) framework, the Third Circuit has also "set out three factors for courts to consider in contemplating spoliation sanctions, which—it recently clarified—are still applicable to motions governed by" the current iteration of Rule 37(e). *See Peronace*, 2024 WL 1660543, at *6–7. Namely:

> (1) the degree of fault of the party who altered or destroyed the evidence;
>
> (2) the degree of prejudice suffered by the opposing party; and
>
> (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.

*See id.* (citing *Bistrian v. Levi*, 448 F. Supp. 3d 454, 466 (E.D. Pa. 2020)).

If the Court finds that the party who committed spoliation acted with an intent to deprive another party of the information's use in the litigation, the Court may consider whether more severe sanctions, such as an adverse inference instruction or entry of default judgment, are warranted. *See Capps v. Dixon*, No. CV 20-1118 (RMB/AMD), 2023 WL 8257995, at *4 (D.N.J. Nov. 28, 2023 (citing Fed. R. Civ. P. 37(e)(2)). "Because direct evidence of intent is not typically available, courts generally look to circumstantial evidence to infer a party's intent," including "the timing of the destruction, whether there was selective preservation, and what preservation policies the party had in place." *Nagy v. Outback Steakhouse*, Civil Action No. 19-18277(MAS)(DEA), 2024 WL 712156, at *5 (D.N.J. Feb. 21, 2024).

Under Rule 37(e), "[p]rejudice to opposing parties requires a showing [that] the spoliation 'materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of his case.'" *Donofrio v. Ikea US Retail, LLC*, No. CV 18-599, 2024 WL 1998094, at *30 (E.D. Pa. May 6, 2024) (citing *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012)).[7]

That is certainly the case here. As explained in Mr. Merlino's Declaration (**Ex. B** hereto), GWSI's apparent destruction of the original native file of the 2024 Alternative Version of the Warehouse Services Agreement has irreparably impeded CMPC's ability to prove GWSI's fraud through examination of all available metadata associated with that original native file. (Merlino Decl. ¶ 19.) That additional metadata includes both operating system level metadata and application level metadata, all of which would provide CMPC additional digital evidence to analyze in connection with how the Alternative Version of the Warehouse Services Agreement was created, by whom, when, and through what applications. (Merlino Decl. ¶¶ 13-23.)

And the law is well-established that this type of destruction of original metadata constitutes clear prejudice to CMPC. *See Bull*, 665 F.3d at 73 ("[P]roducing copies in instances where the originals have been requested may constitute spoliation if it would prevent discovering critical information."); *Davis v. Healthcare Servs. Grp., Inc.*, No. 2:16-cv-2401, 2017 U.S. Dist. LEXIS 238613 at *10 (E.D. Pa. Sep. 5, 2017) (finding that ESI was lost where the "use of copies rather than the original ... prevents the collection of potentially relevant metadata from the original"). In the words of this court from a recent case: GWSI's spoliation "has hamstrung [CMPC's] efforts to determine" how GWSI manipulated the parties' actual agreement. *See Int'l Fin.*, 2019 WL

---

[7] Some courts have gone so far as to rule that where evidence was destroyed in bad faith, "the burden shifts to the spoliating party to show lack of prejudice." *See GN Netcom, Inc. v. Plantronics, Inc.*, No. CV 12-1318-LPS, 2016 WL 3792833, at *6 (D. Del. July 12, 2016).

2268961, at *16. This alone is therefore sufficient to sanction GWSI under Fed. R. Civ. P. 37(e). *See id.*

But the Third Circuit has also given the following specific examples of other forms of prejudice to the opposing party in the context of assessing the necessity of sanctions:

> [T]he irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party. Prejudice also includes deprivation of information through non-cooperation with discovery, and costs expended obtaining court orders to force compliance with discovery.

*Donofrio*, 2024 WL 1998094, at *35 (quoting *Adams v. Trustees*, 29 F.3d 863, 873-74 (3d Cir. 1994) (internal citation omitted)).

Thus, the prejudice to the adverse party accordingly need not rise to the level of some "irremediable harm." *See id.* (quoting *Curtis*, 843 F.2d at 693). Rather, prejudice has also been found "where a party's willful non-disclosure provided the party with a 'clear litigation advantage.'" *See id.* (quoting *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 99 (D.N.J. 2006) (finding defendants' persistent pattern of delay, evasive responses to Plaintiffs' discovery requests, and lack of candor to Plaintiffs and the court caused "crushing prejudice to Plaintiffs in the form of . . . . extraordinary expenditures of time, effort, and money.")).

As noted above, even apart from the destruction of critical evidence, the prejudice to CMPC as a result of GWSI's fraud has been extreme. The cost that CMPC has thus far borne to defend against GWSI's claims and to uncover GWSI's fraud has been immense. And GWSI's fraud has served no other purpose than seeking to obtain a litigation advantage.

In total, the prejudice to CMPC in this case has been nothing short of extreme, and courts regularly find prejudice under Fed. R. Civ. P. 37(e) under far less extraordinary circumstances. *See GN Netcom, Inc.*, 930 F.3d at 83 (finding prejudice where the non-spoliating party "plausibly suggested" that the deleted emails could contain relevant information); *Orion Drilling Co., LLC v.*

*EQT Prod. Co.*, No. CV 16-1516, 2019 WL 4273861, at \*33 (W.D. Pa. September 10, 2019) ("The prejudice sustained is not fanciful given both employees acknowledged that they recorded contemporaneous notes regarding Rig 17 and Rig 18 drilling and rig operations and the contracts at issue" and those notes were not preserved.); *Nagy*, 2024 WL 712156, at \*6 ("Plaintiffs have been prejudiced in that the video footage from the surveillance camera could have been probative of several key issues in this case.").

To put it plainly, because GWSI's conduct has "clearly prejudiced" CMPC, the Court should find that this factor weighs in favor of sanctions. *See Gentex Corp. v. Sutter*, 827 F. Supp. 2d 384, 391 (M.D. Pa. 2011) (finding prejudice where defendants deleted electronic files and erased data off thumb drives).

That said, in the Third Circuit, "a finding of bad faith is pivotal to a spoliation determination." *See Int'l Fin*, 2019 WL 2268961, at \*12–13 (quoting *Bull*, 665 F.3d at 79; *see also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995) (distinguishing between accidental spoliation and situations "indicat[ing] fraud and a desire to suppress the truth.")). "To make a determination of bad faith, the court must find that the spoliating party 'intended to impair the ability of the potential defendant to defend itself.'" *See Donofrio*, 2024 WL 1998094, at \*28 (quoting *Micron Tech., Inc. v. Rambus Inc.*, 917 F. Supp. 2d 300, 315 (D. Del. Jan. 2, 2013)); *In re Hechinger Inv. Co. of Del., Inc.*, 489 F.3d 568, 579 (3d Cir. 2007) (noting that bad faith requires a showing that the litigant "intentionally destroyed documents that it knew would be important or useful to [its opponent]").

As summarized above, it is clear that GWSI has engaged in the bad-faith intentional destruction of ESI to impair CMPC's ability to use that information in its defense. *See, e.g., Int'l Fin.*, 2019 WL 2268961, at \*15 (finding bad faith where party tampered with metadata); *see also*

*Orion*, 2019 WL 4273861, at *32, *aff'd* 826 F. App'x 204, 218 (3d Cir. 2020) (finding the spoliating party "acted in bad faith" when it failed to "preserve evidence in the possession of two key employees" despite knowing litigation was likely imminent); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488 (S.D.N.Y. 2016) (reasonable to infer that the intentional altering of emails was done in order to manipulate electronically stored information for purposes of litigation); *GN Netcom*, 2016 WL 3792833 (concluding that top executive acted in bad faith with intent to deprive because court could only conclude that at least part of the motivation was to deprive the party of discovery); *O'Berry v. Turner*, No. 7:15-CV-00064-HL, 2016 WL 1700403 (M.D. Ga. Apr. 27, 2016) (finding loss of only copy of subsequently deleted electronically stored information could only have resulted if defendants had acted with intent to deprive).

Therefore, as in the *Jabali-Jeter* case, "[g]iven the high degree of [GWSI's] fault and the fact [it] undertook affirmative actions to purposely obscure and destroy evidence, this factor weighs heavily in favor of sanctions." *See* 2019 WL 2268961, at *15.[8]

Lastly, GWSI's litigation misconduct further supports sanctions under Fed. R. Civ. P. 37(e). Under Fed. R. Civ. P. 37(e), a "history of dilatoriness" is demonstrated by "[e]xtensive or repeated delay or delinquency," such as "consistent non-response to interrogatories." *Adams*, 29 F.3d at 874; *see also Ware*, 322 F.3d at 224. Courts thus evaluate "a party's problematic acts ... in light of its behavior over the life of the case." *Adams*, 29 F.3d at 874. Here, as summarized above,

---

[8] It is also within this Court's power to convene an evidentiary or "integrity" hearing to permit the Court to assess the credibility of Defendants Gerace, Burke, and GWSI. *See e.g., DVComm, LLC v. Hotwire Comm., LLC*, et al., Civ. A. No. 14-5543, 2016 WL 6246824, at *1 (E.D. Pa. Feb. 3, 2016) (imposing sanctions after evaluating credibility of alleged spoliators); *GN Netcom*, 2016 WL 3792833, at *1 (same); *see also Wachtel*, 239 F.R.D. at 107 (finding bad faith where documents "would not have seen the light of day had the Court not taken the extraordinary step of convening an Integrity Hearing to look into litigation abuses[.]").

rather than come clean with the actual facts related to the parties' agreement, GWSI has consistently provided purposefully non-responsive answers to CMPC's Interrogatories and Requests for Admission—all of which can only be interpreted as a strategic decision to delay CMPC's resolution of GWSI's claims on the merits. (*See supra* pp. 18-20.)

Because the case law demonstrates that each factor under Fed. R. Civ. P. 37(e) weighs in favor of sanctions, the Court should once again consider the appropriate sanction. On this question, the "range" of measures a district court is authorized to impose under Rule 37(e)(1) is "quite broad." *See Donofrio*, 2024 WL 1998094, at *32 (quoting 60 Fed. R. Civ. P. Advisory Committee Notes, Fed. R. Civ. P. 37.). It includes striking certain evidence, permitting "evidence and argument to the jury regarding the loss of information," and instructing the jury as to how to evaluate the loss of information. *See id*. It also includes requiring the spoliating party to pay the reasonable attorney's fees incurred by the other side in litigating the loss of the ESI. *See id*. (citing *Bistrian*, 448 F. Supp. 3d at 478).

But potential sanctions under Rule 37(e) may also include "dismissal of a claim or the entry of judgment in favor of a prejudiced party; the suppression of evidence; an adverse evidentiary inference, such as the 'spoliation inference'; fines; and attorney fees and costs." *See AMG Nat'l Trust Bank v. Ries*, No. 06-CV-4337, 2011 WL 3099629, at *4 (E.D. Pa. Jul. 22, 2011) (citing *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110-11 (E.D. Pa. 2005)).

Here, for all the reasons summarized above, the Court should—under either its inherent authority or pursuant to Fed. R. Civ. P. 37(e)—dismiss GWSI's claims and enter a default judgment against GWSI. *See id*.[9]

---

[9] In the alternative, if the Court is not convinced that dismissal is appropriate at this time, CMPC's respectfully requests that Court permit CMPC to take further discovery of the facts surrounding the implementation of GWSI's litigation hold, including its document preservation and collection efforts, and to conduct a search of GWSI's backup tapes. *See Cohn v. Guaranteed Rate, Inc*., 318

**II.     If the Court does not Dismiss GWSI's Claims, the Court Should Compel GWSI to Supplement its Responses to CMPC's Interrogatories and Requests for Admission.**

In the alternative, and only if the Court does not dismiss GWSI's claims and enter a default judgment, the Court should compel GWSI to supplement its responses to CMPC's Interrogatories and Requests for Admission, as set forth below.[10]

**A.     The Court Should Order GWSI to Supplement or Amend its Responses and Objections to CMPC's Requests for Admission.**

As noted above, GWSI has taken the position in multiple responses to CMPC's Requests for Admission that the February 1, 2021 Warehouse Services Agreement is not the final version of the parties' agreement, that it is an "incorrect" version, and that GWSI provided the February 1, 2021 Warehouse Services Agreement to CMPC in April 2021 "in error." (**Ex. 20** to Stevens Decl.) GWSI has also taken the position that there is no evidence that GWSI contemporaneously executed and exchanged the February 1, 2021 Warehouse Services Agreement with CMPC.  (*Id.*)

But as summarized above, the documentary evidence shows otherwise. Specifically, the documentary evidence demonstrates that GWSI executed the February 1, 2021 Warehouse Services Agreement and sent its fully-executed copy of the agreement to CMPC on February 9,

---

F.R.D. 350 (N.D. Ill. 2016) (granting additional discovery). That additional discovery would take the form of additional interrogatories, requests for production, and a deposition of a corporate representative of GWSI to be designated on these topics. CMPC also requests that the Court permit CMPC (at GWSI's expense) to forensically examine and image the hard drives of the computers used by Defendant Gerace, Defendant Burke, and Phil Sinatra. *See Treppel v. Biovail Corp.*, 249 F.R.D. 111, 124 (S.D.N.Y. 2008) (permitting searching of backups and a "thorough forensic examination" of spoliator's laptop at his expense). This type of forensic examination would further enable CMPC to analyze the additional metadata associated with the native files of each iteration of the warehouse services possession in GWSI's possession. (Merlino Decl. ¶¶ 13-23.) In this alternative scenario, CMPC further respectfully requests that the Court extend the deadlines for the completion of discovery so that CMPC may conduct this additional discovery.

[10] In compliance with Local Rule 26.1(b), GWSI's Responses and Objections to CMPC's Requests for Admission, Interrogatories, and Requests for Productions are attached as Exhibits **20**, **21**, and **26** to Stevens Decl., and the relevant portions at issue are clearly identified therein.

2021. (**Ex. 4** to Stevens Decl.) GWSI then sent the same exact version of the agreement to CMPC for a *second* time in April 2021. (**Ex. 13** to Stevens Decl.)

Rule 26(e)(1) provides that a party which has responded to a request for admission must supplement or correct its response in a timely manner if the party learns that the response is incomplete or incorrect in a material respect. *See* Fed. R. Civ. P. 26(e)(1). The Court should therefore order GWSI to supplement or correct its responses to CMPC's Requests for Admission that seek admission related to GWSI's execution of the February 1, 2021 Warehouse Services Agreement. *See Baby Neal v. Thomas P. Ridge,* No. CIV. A. 90-2343, 1996 WL 4050, at *5 (E.D. Pa. Jan. 2, 1996) (granting motion to compel amended responses to requests for admission).

The Court should therefore order GWSI to correct or supplement its responses to each Request for Admission in which it offers these unsupported and inaccurate responses, namely: Nos. 4, 34, 35, 36, 37, 38, 39, 46, 47, 52, and 63.[11]

## B.  GWSI Has Failed to Answer Each Interrogatory Fully and Candidly.

Federal Rule of Civil Procedure 33(b) provides in relevant part that "[e]ach interrogatory must, to the extent it is not objected to, be answered separately and *fully* in writing under oath." *See Buckley v. Clifford Chance LLP*, No. 2:06-CV-1003-LDD, 2008 WL 11365193, at *1 (E.D. Pa. June 12, 2008) (citing Fed. R. Civ. P. 33(b) (emphasis added)). Courts have thus interpreted this as requiring a narrative response. *See Great Lakes Ins. S.E. v. Sunshine Shopping Ctr., Inc*., No. 1:19-CV-00039, 2020 WL 9809840, at *2 (D.V.I. June 22, 2020).

Under established Third Circuit law, parties must therefore provide "true, explicit, responsive, complete, and candid answers to interrogatories." *See Hansel v. Shell Oil Corp*., 169 F.R.D. 303, 305 (E.D. Pa. 1996) (despite a claim that they had "evidentiary support" for their

---

[11] On October 22, GWSI agreed to supplement its responses to Request Nos. 30, 32, and 33. (**Ex. 27** to Stevens Decl.)

allegations, plaintiffs failed to provide it "explicitly, candidly and completely"). The candor required is "a candid statement of the information sought or of the fact that objection is made furnishing the information." *See Rector Church Warden's v. Hussman Corp.*, No. CIV. A. 91-7310, 1993 WL 29147, at *1 (E.D. Pa. Feb. 4, 1993). Federal Rule of Civil Procedure 37(a)(4) therefore provides that "an evasive or incomplete disclosure, answer or response must be treated as a failure to disclose, answer or respond." *Clearview Fin. Serviced, LLC v. Weiss*, No. CIV. A. 2011-88, 2012 WL 1739070, at *3 (D.V.I. May 16, 2012). An answer must also "be responsive to the question." *See Am. Health Sys., Inc. v. Liberty Health Sys.*, No. CIV. A. 90-3112, 1991 WL 30726, at *2 (E.D. Pa. Mar. 5, 1991).

Indeed, the discovery process is designed "to make a trial 'less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent possible.'" *JMJ Enterprises, Inc. v. Via Veneto Italian Ice, Inc.*, No. 97-CV-0652, 1998 WL 272163, at *2 (E.D. Pa. May 27, 1998), *aff'd*, 178 F.3d 1279 (3d Cir. 1999) (quoting *Hansel*, 169 F.R.D. at 305). Discovery is also intended "to narrow and clarify the issues in dispute." *See Hansel* 169 F.R.D. at 305 (citing *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). The use of interrogatories is accordingly "intended to narrow the issues for trial by assisting in the ascertainment of relevant facts and the procurement and securing of evidence which may be pertinent to the action." *See Wallace v. Gen. Elec. Co.*, No. CIV.A. 87-1236, 1988 WL 99650, at *4 (E.D. Pa. Sept. 22, 1988). Interrogatories are otherwise ineffective unless parties live up to their duty to provide candid answers. *See Hansel*, 169 F.R.D. at 305.

Moreover, if a party is unable to supply the requested information, "the party may not simply refuse to answer, but must state under oath that he is unable to provide the information and set forth the efforts he used to obtain the information." *See Easley v. Tritt*, No. 1:17-CV-930, 2020

WL 1911536, at *8 (M.D. Pa. Apr. 20, 2020) (citing *Miller v. Nat'l Sch. of Health Tech.*, 73 F.R.D. 628, 632 (E.D. Pa. 1977)). Under this standard, an interrogatory response is deficient if it does not disclose whether the party is in possession, custody, or control of "any records or logs from which [a party] can refresh [the party's] recollection or ascertain the requested information." *See Oke v. Crowuther*, No. 1:18-cv-323, 2019 WL 4393388, at *2 (W.D. Pa. Sept. 14, 2019).

Ultimately, "the question of what constitutes satisfactory responses to interrogatories rests within the sound discretion of the Court and includes the consideration of undue burden to the parties." *See Martin v. Easton Publishing Co.,* 85 F.R.D. 312, 316 (E.D. Pa. 1980).

### i. In Response to Interrogatory No. 1, GWSI Refuses to Explain How the February 1, 2021 Warehouse Services Agreement is "Not the Final" Version of the Parties' Agreement.

CMPC's Interrogatory No. 1 asked GWSI to identify the material facts related to the formation, negotiation, and execution of the Parties' February 1, 2021 Warehouse Services Agreement. (**Ex. 21** to Stevens Decl.) In accordance with the definition of the "February 1, 2021 Warehouse Services Agreement," Interrogatory No. 1 thus seeks material facts related to the version of the agreement that was signed and executed by GWSI and then provided by email from GWSI to CMPC in 2021. (*Id.*)

GWSI's response to CMPC's Interrogatory No. 1, however, is non-responsive. Instead, in its response to Interrogatory No. 1, GWSI objects on the basis that this particular version of the agreement is "not the final" version, and GWSI therefore proceeds to identify material facts related to the Alternative Version of the Agreement (which is the subject of CMPC's Interrogatory No 7). (*Id.*)

But even if GWSI contends that the February 1, 2021 Warehouse Services Agreement is "not the final" version, Interrogatory No 1 nevertheless requires GWSI to provide a narrative response related to the material facts concerning the drafting, negotiation, and exchange of this

particular version of the agreement. If GWSI contends that this is not the final version, then GWSI should nevertheless explain how and why the parties twice exchanged a signed version of this iteration of the agreement, once in February 2021 and again in April 2021. GWSI should also identify all other material facts that support GWSI's position that the February 1, 2021 Warehouse Services Agreement was not final and that GWSI's delivery of this signed version of the agreement to CMPC was somehow the result of a mistake.

The Court should therefore order GWSI to supplement or amend its response to Interrogatory No. 1 to provide a responsive answer.

### ii. In Response to CMPC's Interrogatory No. 7, GWSI Refuses to Provide Any Details in Support of an Alleged In-Person Meeting Between the Parties in Charleston in February 2021.

In response to CMPC's Interrogatory No. 7, which asked for GWSI to identify material facts related to the formation, negotiation, and execution of the Alternative Version of the Warehouse Services Agreement, GWSI provided the following response:

> GWSI provided the original draft of the Warehouse Services Agreement and began to negotiate some of its standard terms and conditions with CMPC. GWSI then, however, insisted that CMPC largely accept its standard agreement, terms, and conditions. In furtherance thereof, in February 2021, Michael Gerace met with Joaquin Rojas and Vic Moreira in Charleston, South Carolina. During this meeting, GWSI believes it executed the Warehouse Services Agreement. In addition, the parties' course of performance demonstrated the intent of the parties to the Warehouse Services Agreement and Transportation Services Agreement, including, without limitation, CMPC's negotiation and express agreement to Rate Schedules that included shortfall penalties.

**(Ex. 21** to Stevens Decl.)

This response plainly does not satisfy GWSI's obligation to respond to Interrogatory No. 7 fully and with candor, for at least the following reasons:

1. GWSI does not provide any details as to *how* these additional negotiations took place, *what* substantive provisions were at issue, or *who* was negotiating them.

2. GWSI does not identify the specific date and time of the alleged meeting between Michael Gerace, Joaquin Rojas, and Vic Moreira in Charleston, South Carolina, or any other details related to the alleged meeting, such as the specific location of the meeting, its length, and whether any other individuals were present.

3. GWSI does not explain whether either Joaquin Rojas or Vic Moreira also allegedly executed the Alternative Warehouse Services Agreement at this meeting. GWSI's response states only that "GWSI believes it executed" the agreement at this meeting.

4. GWSI also does not explain why GWSI's signature on the Alternative Warehouse Services Agreement is dated February 1, 2021, even though GWSI has admitted that February 1, 2021 is not the date that GWSI allegedly signed the Alternative Version. (*See* GWSI Response to Request for Admission No. 50 [**Ex. 20** to Stevens Decl.].)

The Court should therefore order GWSI to supplement its response to Interrogatory No. 7 to provide these additional details.

### iii. GWSI Refuses to Identify Persons with Whom it Communicated about CMPC in Response to Interrogatory No. 17.

Interrogatory No. 17 asks GWSI to identify the persons with which GWSI has communicated regarding CMPC's alleged breaches of contract and the subsequent warehouse lien GWSI placed on CMPC's Goods. (**Ex. 21** to Stevens Decl.) As CMPC later clarified in response to GWSI's request (**Ex. 22** to Stevens Decl.), Interrogatory No. 17 is aimed at identifying CMPC's agents, customers, or agents of its customers, with whom GWSI communicated with on or after May 13, 2024 in connection with the warehouse lien that GWSI placed on CMPC's Goods.

Nevertheless, GWSI has refused to identify the persons with whom GWSI communicated on these topics. Because this request seeks relevant and proportional information, the Court should order GWSI to supplement its response to this Interrogatory No. 17.

### iv. GWSI Refuses to Identify Other Agreements for "Contract Warehousing" in Response to Interrogatory No. 19.

GWSI alleged in its initial Complaint against CMPC that the Parties had entered into a "Contract Warehousing" arrangement, a term defined by GWSI in Paragraph 13 of its initial Complaint to refer to an arrangement that GWSI alleges is common in the industry.[12] (GWSI's Compl. [Dkt. No. 1-1 in Case No. 02394] ¶ 31.) According to GWSI, under a "Contract Warehousing" arrangement, customers "commit to shipping and storing a minimum volume of products to GWSI's warehouses." (*Id.* ¶ 28.) According to its initial Complaint, GWSI enters into "Contract Warehousing" agreements "infrequently." (*Id.* ¶ 13.)

CMPC's Interrogatory No. 19 thus asked GWSI to identify each such "Contract Warehousing" agreement that it has entered into and to identify the parties and effective dates of each such agreement. (**Ex. 21** to Stevens Decl.) CMPC's Request for Production Nos. 4-5 then asked GWSI to produce each such agreement, in addition to the documents that evidence GWSI's invoicing for shortfall penalties pursuant to these agreements. (**Ex. 26** to Stevens Decl.)

GWSI in response, however, objected to doing so on a number of bases including relevance and burdensomeness. None of GWSI's objections have any merit. The "Contract Warehousing" agreements that are the subject of Interrogatory No. 19 are directly relevant to GWSI's allegation that the Parties' agreements here contained commitments by CMPC to ship minimum volumes to GWSI. Indeed, if CMPC's agreement with GWSI included a minimum volume commitment and an agreement to pay shortfall penalties, one would expect CMPC's agreement with GWSI to resemble the "Contract Warehousing" agreements referenced in GWSI's Complaint. On the other

---

[12] Although GWSI removed its reference to Contract Warehousing in its Amended Complaint, this does not moot GWSI's obligation to provide the information requested by Interrogatory No. 19. Moreover, GWSI effectively makes the same allegation in its Amended Complaint, namely, that CMPC entered into a "volume-based agreement" with GWSI. (GWSI's Am. Compl. [Dkt. No. 41] ¶¶ 22-23, 28.)

hand, the absence of certain provisions found in "Contract Warehousing" agreements in CMPC's agreement with GWSI would suggest the opposite.

Nor is Interrogatory No. 19 overly burdensome. By its terms, Interrogatory No. 19 has asked GWSI to identify certain contracts, including by name and effective date. There is no undue burden in asking GWSI to do so, and even if there is, then GWSI must invoke Fed. R. Civ. P. 33(d) rather than flatly refuse to provide the relevant information. In any event, GWSI's objection is based on the proposition that "GWSI has served numerous customers over the last four years," which is insufficient to state a burdensomeness objection with the requisite specificity. This statement also contradicts GWSI's verified allegation that it only enters into such agreements "infrequently."

The Court should therefore order GWSI to identify the agreements responsive to Interrogatory No. 19 and to then produce in response to CMPC Requests for Production Nos. 4-5 those agreements and the documents that evidence GWSI's invoicing for shortfall penalties pursuant to those agreements.[13]

### C. These Interrogatories are Not Contention Interrogatories.

In its correspondence, GWSI has indicated that it objects to supplementing its responses to these interrogatories because they are "contention interrogatories," which GWSI will only agree to supplement upon the close of discovery. (**Ex. 23** to Stevens Decl.) But as demonstrated below, these are not contention interrogatories.

First, Interrogatory No. 17 asks GWSI to identify persons with whom GWSI has communicated regarding certain conduct. This is not a contention interrogatory. *See Dalmatia Imp.*

---

[13] For the avoidance of doubt, given that GWSI is continuing to produce documents, this specific request should not be construed as a waiver of any of CMPC's rights to seek to compel the production of additional documents in response to other Requests for Production.

*Grp., Inc. v. Foodmatch, Inc.*, No. CV 16-2767, 2016 WL 5721161, at *1 (E.D. Pa. Oct. 3, 2016) ("Interrogatories that seek the identification of documents or of witnesses are not contention interrogatories."). Second, Interrogatory No. 19 asks GWSI to identify each agreement that it has entered for "Contract Warehousing." This is not a contention interrogatory for the same reason. *See id.*

Third, Interrogatory Nos. 1-2 asks GWSI to identify the material facts, documents and communications underlying the parties' drafting, negotiation, and execution of the February 1, 2021 Warehouse Services Agreement. There is simply no "contention" identified in Interrogatory No. 1 whatsoever.

As for Interrogatory Nos. 7-8, GWSI has already provided a narrative response to Interrogatory No. 7, and that narrative response appears to be inaccurate and inconsistent with the facts and available metadata related to the Alternative Version of the Warehouse Services Agreement. (*See supra* pp. 10-14.) As summarized above, Mike Gerace and Kevin Burke each sent the February 1, 2021 Warehouse Services Agreement to CMPC by email, once in February 2021 and again in April 2021. (**Ex.'s 4, 13** to Stevens Decl.)

The signature for CMPC is also identical to the signature affixed to the February 1, 2021 Warehouse Services Agreement, which was provided to GWSI over email (**Ex. 12** to Stevens Decl.)—which is obviously wholly inconsistent with the notion that the parties later met in person to negotiate and execute a different version of the agreement. And the metadata associated with the document indicates that the Alternative Version was not created until February 20, 2024 when it was scanned into PDF using a multifunction printer. (*See supra* pp. 13-14.)

GWSI and its counsel therefore have an obligation under Fed. R. Civ. P. 26(e)(1) to correct GWSI's response to Interrogatory No. 7, or at a minimum, supplement it so as to set forth the facts that address and explain these issues.

### i. Even if it May be Characterized as a "Contention" Interrogatory, a Full and Candid Response to Interrogatory No. 7 will Materially Advance the Issues in this Case.

To the extent that Interrogatory No. 7 can be characterized as a "contention interrogatory" at all (which CMPC does not concede), it is clear that an early, fulsome answer to this Interrogatory "will contribute meaningfully to clarifying the issues in the case, narrowing the scope of the dispute, or setting up early settlement discussions, or that such answers are likely to expose a substantial basis for a motion under Rule 11 or Rule 56." *See B. Braun Med. Inc. v. Abbott Lab'ys*, 155 F.R.D. 525 (E.D. Pa. 1994) (citations omitted).

Indeed, that GWSI refuses to even identify the date of the alleged in-person meeting in February 2021 in Charleston, South Carolina is sufficient grounds alone to compel the supplementation of this response. Nor is GWSI willing to identify a single document or communication that it alleges evidences this alleged in-person meeting. CMPC should not be forced to wait until the deposition of Defendant Gerace to get answers to these fundamental and critical questions, all of which should be readily available to GWSI at this time. GWSI's effort to sandbag CMPC on these fundamental details until a deposition injects delay into this litigation without any good reason and only serves to impede CMPC's preparation and prosecution of its claims.

For these reasons, even if Interrogatory No. 7 may be characterized as a "contention interrogatory," the Court should exercise its discretion and order GWSI to provide a fulsome narrative response to Interrogatory No 7 at this time. *See Abbott*, 155 F.R.D. at 525.

### D. GWSI Refuses to Specifically Identify the Business Records that it Relies on in Support of its Claims and Interrogatory Responses.

Throughout its interrogatory responses, GWSI does not identify a single document or communication in support of any of its responses. (**Ex. 21** to Stevens Decl.) Instead, GWSI states that "certain information contained in [these interrogatories] is contained in documents that have or will be produced in connection with GWSI's responses to CMPC's requests for production of documents."[14] (*Id.*)

GWSI also states that the Parties allegedly had an understanding that the "purpose and intent" of the Parties' relationship was that "GWSI would only devote space in its warehouses exclusively to CMPC goods if CMPC agreed to deliver a minimum volume of product." (*See, e.g.* Response to Interrogatory No. 9 [**Ex. 21** to Stevens Decl.].) GWSI also states that the Parties' "course of performance demonstrated" an intent that CMPC had committed to shipping minimum volumes to GWSI. (**Ex. 21** to Stevens Decl.) Yet throughout its responses GWSI does not identify a single document or communication in support of these statements.

This is plainly insufficient. In lieu of a narrative response, Rule 33(d) allows a party to respond to an interrogatory by referencing "business records." *See Great Lakes*, 2020 WL 9809840, at *2. However, the rule is limited to "business records" and may be invoked only "if the burden of deriving or ascertaining the answer will be substantially the same for either party...." *See id.* (citing Fed. R. Civ. P. 33(d)). Further, such a response must specify the records "*in sufficient detail* to enable the interrogating party to locate and identify them as readily as the responding party could...." *See id*. (citing Fed. R. Civ. P. 33(d)(1) (emphasis original).

---

[14] As noted above, GWSI also informed counsel for CMPC that it intended to make its first substantial production of its internal emails on October 30 (the deadline to file discovery related motions). (**Ex. 24** to Stevens Decl.) That GWSI is continuing to make rolling document productions only further supports the need to have GWSI specifically identify the documents that support its claims and responses.

In any responses that make use of Rule 33(d), GWSI must also specify the documents in detail. *See Schreiber v. Eli Lilly & Co*., No. 05-CV-2616, 2007 WL 9821904, at *2 (E.D. Pa. Mar. 19, 2007). Specifically, GWSI "may not impose on [CMPC] a mass of records as to which research is feasible only for one familiar with the records." *See id*. (citing Fed. R. Civ. P. 33 advisory committee's note, 1980 amendment).

Furthermore, Rule 33(d) cannot be used to evade answering the interrogatories. *See id.* The documents that are referenced by GWSI must in fact contain the answer to the Interrogatory. *See Caruso v. Coleman Co*., No. 93-CV-6733, 1995 WL 262521, at *3 (E.D. Pa. Apr. 28, 1995) ("When a responding party invokes Rule 33(d)'s option ... he still has a duty to supply all the information requested and cannot avoid answers by producing documents in which the information may or may not be found."); *Budget Rent-a-Car of Missouri, Inc. v. Hertz Corp*., 55 F.R.D. 354, 357 (W.D. Mo. 1972) ("Rule 33 cannot, therefore, be used as a procedural device for avoiding the duty to give information by shifting the obligation to find out whether information is ascertainable from the records which have been tendered.").

Put differently, GWSI cannot "merely offer [its] business records for inspection, but has a 'duty to specify, by category and location' the records from which he knows the answers to the interrogatories can be found. *See Caruso*, 1995 WL 262521, at *3 (citing 4A Moore's Federal Practice (2d ed. 1994) ¶ 33.25[5]). For example, the specification requirement was not met when a defendant responded to interrogatories by general reference to 33,000 documents already produced. *See Derson Group, Ltd. v. Right Management Consultants, Inc*., 119 F.R.D. 396 (N.D. Ill. 1988).

Contrary to this case law, this is exactly what GWSI has done here throughout its interrogatory responses. (*See* **Ex. 21** to Stevens Decl.) The Court should therefore order GWSI to

supplement its responses to Interrogatory Nos. 1, 3, 5, 7, 9, 12, 15, 21, and 24 so as to specifically identify the documents that it relies on in support of its responses and in support of its claims. In doing so, the Court should order GWSI to supplement or amend its responses to these interrogatories to identify the material documents and communications currently known to GWSI that supports its responses to CMPC's Interrogatories. And if GWSI intends to rely on Fed. R. Civ. P. 33(d) to produce business records in connection with its interrogatory responses, then GWSI should be ordered to invoke that rule explicitly and comply with the requirements of that rule.

## CONCLUSION

For all the foregoing reasons, the Court should impose case-ending sanctions on GWSI for its bad faith spoliation and fabrication of evidence in this matter. The Court should also award CMPC its reasonable attorney's fees and expenses and defending against GWSI's meritless claims.

In the alternative, if the Court is not convinced that it should dismiss GWSI's claims now, CMPC respectfully requests that the Court permit CMPC to take additional discovery regarding GWSI's spoliation and fabrication of evidence. Also in the alternative, CMPC requests that the Court order GWSI to supplement its discovery responses, as set forth above. A proposed order granting this Motion is attached hereto as **Exhibit C**.

Respectfully submitted this 30th day of October, 2024.

/s/ Michael J. O'Brien

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**

Michael J. O'Brien, Esq.
Pa. ID No. 307321
Sarah Boutros, Esq.
Pa. ID No. 328888
Two Liberty Place

50 S. 16th St., 22nd Floor
Philadelphia, PA 19102
Phone: (215) 851-8532
Email: mobrien@eckertseamans.com
      sboutros@eckertseamans.com

**PARKER, HUDSON, RAINER & DOBBS, LLP**

David B. Darden (*admitted pro hac vice*)
Georgia Bar No. 250341
David A. O'Neal (*admitted pro hac vice*)
Georgia Bar No. 342071
Andrew C. Stevens (*admitted pro hac vice*)
Georgia Bar No. 183366
303 Peachtree Street, N.E., Suite 3600
Atlanta, Georgia 30308
Phone: (404) 520-5300
Atlanta, Georgia 30308
Email: ddarden@phrd.com
      doneal@phrd.com
      dstevens@phrd.com

*Counsel for CMPC USA, Inc. and CMPC Forest Products NA LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 30, 2024, a true and correct copy of the foregoing CMPC USA, Inc. and CMPC Forest Products NA LLC's Memorandum in Support of Motion for Sanctions, or, in the Alternative, to Compel, was filed with the Court via the ECF system and served upon all counsel of record for GWSI, Inc., M. Gerace Enterprises, Inc., Kevin Burke, and Michael Gerace through the same system and by email at the addresses listed below.

Mark D. Villanueva, Esq.
Corey S.D. Norcross, Esq.
Michael J. Wise, Esq.
Robert J. Norcia, Esq.
Stradley Ronon Stevens & Young, LLP
2005 Market Street, Suite 2600
Philadelphia, PA 19103
mvillanueva@stradley.com
cnorcross@stradley.com
mwise@stradley.com
rnorcia@stradley.com

By:     /s/ Michael J. O'Brien
         Michael J. O'Brien, Esq.