**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CMPC USA, INC., <br><br> Plaintiff, <br><br> v. <br><br> GWSI, INC., M. GERACE ENTERPRISES, INC., KEVIN BURKE, in his individual capacity, MICHAEL GERACE, in his individual capacity, <br><br> Defendants. <hr> GWSI, INC. & M. GERACE ENTERPRISES, INC. <br><br> Plaintiffs, <br><br> v. <br><br> CMPC USA, INC. and CMPC CELULOSA S.A., <br><br> Counterclaim and Third-Party Defendants. | Civil Action No. 2:24-cv-02087-MMB |

**PLAINTIFF CMPC'S OPPOSITION TO DEFENDANTS' MOTION TO QUASH
AND TO STAY SUBPOENAS TO CENTRIC BANK AND CUSTOMERS BANK**

Plaintiff CMPC USA, Inc. ("Plaintiff" or "CMPC"), by and through its undersigned counsel, respectfully moves the Court pursuant to Federal Rules of Civil Procedure 45 for an Order denying Defendants' Motion to Quash and to Stay CMPC's subpoenas duces tecum to Centric Bank and Customers Bank (collectively, "Banks") (Dkt. 199).

**PRELIMINARY STATEMENT**

On the final day of document discovery, Defendants disclosed for the first time that Christopher Bickel, a banker formerly at Centric Bank and now at Customers Bank, possessed hardcopies of the agreements at the center of this dispute.  According to Defendants, Mr. Bickel collected these agreements from Michael Gerace's office in 2022 as part of a loan underwriting visit, kept them in a manila folder in his home office for nearly four years after leaving Centric Bank, and located them only after Gerace—a named Defendant in active litigation—personally asked him to look for those documents in early 2026.

If that account is true, the agreements Mr. Bickel collected would have been part of the Banks' institutional loan file for GWSI, not just loose papers in a former employee's home office. The Banks' records should reflect which version of the agreement GWSI provided to support its loan application.  CMPC issued narrowly targeted subpoenas (the "Subpoenas") to the Banks to answer exactly that question.  They seek no financial information of any kind—only the work files, loan records, and communications of a non-party employee relating to the agreements in dispute.

Having injected Mr. Bickel's account into this litigation as dispositive evidence, Defendants now seek to block any independent verification of it.  But Defendants lack standing to do so: they have no cognizable privacy interest in a former bank employee's records.  And which version of the agreement the Banks' files contain—or whether they contain any version at all— goes directly to the most important question in this case: whether the agreement Defendants relied on to seize $12.4 million of CMPC's goods is authentic or fabricated.

With trial two months away, Defendants should not be allowed to introduce a new witness and new documents as the centerpiece of their defense while simultaneously blocking CMPC from obtaining the independent records necessary to test that evidence, particularly where the Banks have made no objection to the Subpoenas.  The Motion should be denied.

2

## BACKGROUND

At the center of this case is the authenticity of the parties' Warehouse Services Agreement ("WSA"). Defendants have used an "Alternative Version" of the WSA to demand millions of dollars in shortfall penalties under terms CMPC expressly rejected when the parties executed the actual WSA in February 2021. Yet Defendants have never been able to produce a single contemporaneous document from 2021 corroborating that the Alternative Version was ever circulated or executed.

Nor have Defendants ever been able to provide a consistent explanation for where their version of the agreement came from, who had it, or how it was executed. In February 2024, Defendant Kevin Burke told CMPC that GWSI's "attorney has the original copy" and that the attorney was "on vacation." Ex. A. In sworn discovery responses, Defendants represented that Gerace found the agreement "in a filing cabinet in GWSI's offices in Media, Pennsylvania." Ex. B at 47-48. During a Court-ordered meet-and-confer, Defendants' then-counsel Stradley Ronon asserted that the agreement had been executed in person at a meeting between Gerace and CMPC's Joaquin Rojas in Charleston, South Carolina between February 14 and 18, 2021, a claim disproven days later by travel records and passport stamps showing Rojas was in South America during that entire period. (Dkt. 94 at 10).

And now, on March 31, 2026, the final day of the Court's discovery deadline, Defendants served a supplemental disclosure identifying Christopher Bickel, a commercial banker formerly at Centric Bank who handled GWSI's and MGE's banking relationship, as possessing hardcopies of the disputed agreements. Ex. C at 3. In a sworn declaration, Mr. Bickel states that he took copies of these agreements from Mr. Gerace's office during a 2022 loan underwriting visit, kept them in a manila folder in his home for nearly four years after leaving the bank, and never returned them.

3

(Dkt. 199-3 ¶¶ 5-7). He located them only after Mr. Gerace, a named Defendant in this case, personally reached out in 2026 and asked whether Bickel still had documents from that visit. *Id.* ¶ 6. Bickel then turned the documents over not to his employer, but to Defendants' litigation counsel at Morgan Lewis. *Id.* ¶ 9.

Immediately after receiving Defendants' eleventh-hour disclosure, CMPC issued subpoenas to Bickel and his former and current employers, the Banks, to independently verify his account. The Subpoenas seek no account balances, no transaction records, and no financial information of any kind. They seek only: (a) any version of the agreements at issue in the Banks' possession; (b) the loan files from the 2022 underwriting visit, which will show what was actually collected and which version of the agreement GWSI provided to its lender; (c) communications between Bickel and representatives of GWSI, MGE, or Gerace concerning CMPC or the agreements, which will reveal whether the documents followed the ordinary course of a banking relationship or an extraordinary path initiated by a litigation defendant; (d) documents Defendants or their representatives provided to the Banks in or around 2022; (e) Bickel's separation records and the Banks' document-return policies for departing employees; and (f) the Banks' general document retention policies—the last two of which will establish whether the manila folder Mr. Bickel claims to have kept in his home office for nearly four years ever existed in the ordinary course of business, or whether it was assembled for the purposes of this litigation.

What those records reveal will go to the heart of this case. If the Banks have the authentic version of the WSA, Defendants' entire narrative unravels. If they have the Alternative Version, the records will reveal when and how it entered their files. If they have no version at all, the premise of Defendants' latest account falls apart. Defendants' Motion to Quash is an effort to ensure none of these questions are ever answered. It should be denied.

**LEGAL STANDARD**

When resolving motions to quash subpoenas, the subpoenaing party must first show that its requests are relevant to its claims or defenses such that it falls "within the scope of proper discovery under Federal Rule of Civil Procedure 26(b)(1)." *See First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 382 (E.D. Pa. 2013). As such, the information sought need not be confined to admissible evidence and can include information reasonably calculated to lead to the discovery of admissible evidence. *See id.* at 383, n. 12. The moving party then has the burden of establishing a basis to quash the subpoena under Federal Rule of Civil Procedure 45(d). *See id.* This burden is "particularly heavy . . . as contrasted to some more limited protection[s]," *ITOCHU Int'l, Inc. v. Devon Robotics, LLC,* 303 F.R.D. 229, 232 (E.D. Pa. 2014), reflecting the importance of subpoenas in the pursuit of discovery. *See Grasso v. Katz*, 2022 WL 4586125, at *5 (E.D. Pa. Sept. 28, 2022), *aff'd and remanded*, 2023 WL 4615299 (3d Cir. July 19, 2023); *Rehmeyer v. Peake Plastics Corp.*, 2017 WL 4423273, at *2 (E.D. Pa. Oct. 5, 2017).

**ARGUMENT**

**A.    Defendants Lack Standing To Quash The Subpoenas**

As a threshold matter, Defendants lack standing to challenge the Subpoenas. A party ordinarily has no standing to quash a subpoena served on a non-party unless it claims a "personal right or privilege" in the subject matter of the subpoena. *Green v. Cosby*, 216 F. Supp. 3d 560, 563 (E.D. Pa. 2016); *see also Leboon v. Alan Mcilvain Co.*, 2014 WL 11429343, at *1 (E.D. Pa. Mar. 14, 2014) ("only the non-parties whom were served with the subpoenas may move to have them quashed"). Defendants can claim no such right here.

The Subpoenas are narrow and specific. They seek: (a) copies of the agreements between the parties; (b) documents Mr. Bickel provided relating to the parties; (c) communications between the Banks and Defendants' representatives concerning CMPC and the agreements at issue; (d)

documents Defendants or their representatives provided in or around 2022, including any version of the WSA; (e) Mr. Bickel's files, folders, and emails relating to the parties; and (f) the Banks' document retention policies upon employee departure.  The Subpoenas target the work files and communications of a non-party bank employee—not Defendants' own confidential financial information.  The requests do not seek account balances, transaction records, financial statements, or any other category of information in which Defendants could claim a personal right or privilege.  In short, the Banks are subpoenaed not as Defendants' banks, but as Mr. Bickel's employers and custodians of his work product—and the Subpoenas target only the narrow slice of that work product relating to the specific agreements at the center of this dispute.

Defendants' attempt to recast these targeted requests as an open-ended demand for their "financial dealings" (Dkt. 199-1 at 4) is belied by the plain text of the Subpoenas.  It is also unsupported by Defendants' own authorities, every one of which involved subpoenas seeking the movant's confidential financial information—the very category of records absent here.  *See ITOCHU Int'l, Inc.*, 303 F.R.D. at 231–32 (subpoenas to nine banks for financial account records of judgment debtor); *Schmulovich v. 1161 Rt. 9 LLC*, 2007 WL 2362598, at *1 (D.N.J. Aug. 15, 2007) (subpoenas seeking "all documents associated with any business and personal bank accounts"); *Ace Hardware Corp. v. Celebration Ace Hardware, LLC*, 2009 WL 2753197, at *1 (D. Del. Aug. 28, 2009) (movant asserting personal privilege in trust documents held at her bank); *Piazza v. Young*, 2020 WL 6544979, at *2 (M.D. Pa. Nov. 6, 2020) (standing based on defendant's personal interest in records of a criminal investigation into him—not bank records at all).

Here, Defendants have no cognizable interest in the materials actually sought.  A party cannot claim a "personal right or privilege" in a third party's employment records simply because those records may reference it.  *See Norguard Ins. Co. v. Serveon Inc.*, 2011 WL 344076, at *3

(D. Del. Jan. 28, 2011) (denying standing to quash subpoenas served on non-party insurers where movant asserted only a general privacy interest in its business relationships).  The "mere fact that a third-party subpoena seeks information about a party's conduct" does not confer standing; to hold otherwise would allow the exception to "swallow the rule, as presumably, many (if not most) third-party subpoenas seek information concerning one of the other parties in the case."  *Green*, 216 F. Supp. 3d at 564; *see also Shiavone v. Dragados, S.A.,* 2009 WL 10741604, at \*2 (D.N.J. Sept. 4, 2009) (recognizing that a party has standing to move to quash a non-party subpoena only where the party claims a personal privilege in the production sought, and finding the record insufficient to establish such a privilege) *DIRECTV, Inc. v. Richards*, 2005 WL 1514187, at \*4 (D.N.J. June 27, 2005) (observing movant failed to show the bank records contained information that would threaten a personal privilege).

And the absence of any objection from the Banks themselves underscores Defendants' lack of standing.  *See KIRA BACCARI v. KRISTOPHER BACCARI, SHANNON BACCARI, A WILDLIFE PRO, LLC,* 2023 WL 12253391, at \*1(E.D. Pa. May 23, 2023) (defendants lacked standing to challenge subpoenas as unduly burdensome when the subpoenas are directed at third parties); *Schmulovich*, 2007 WL 2362598, at \*4–5 ("any burden to produce would be borne by the financial institutions and not Defendants themselves").  Neither of the Banks has moved to quash, objected, or sought a protective order.

Because Defendants claim no personal privilege in any material the Subpoenas actually seek, and because neither Bank has objected to compliance, Defendants lack standing to move to quash.  The Motion should be denied on that basis alone.

### B.    Defendants' Objections Are Meritless

Even if Defendants had standing to contest the Subpoenas (they do not), their objections fail on the merits.  Defendants raise four arguments: that the Subpoenas seek irrelevant

information, that they are overbroad, that they implicate confidential information, and that the balance of factors favors quashing.  Each fails on its own terms.

### 1.    The Information Sought Is Critically Relevant

The authenticity and provenance of the Alternative Version of the WSA is the central dispute in this litigation.  Defendants' own submissions have now placed Mr. Bickel and both Banks squarely in the middle of that dispute . According to Mr. Bickel's Declaration, he collected agreements from Gerace's office in July or August 2022 as part of a commercial loan underwriting process, left Centric Bank in September 2023, and discovered those agreements in a manila folder in his home office in March 2026—only after a named Defendant in active litigation personally asked him to look.  (Dkt. 199-3 ¶¶ 5–7).  Defendants have since cited these documents as "conclusively disprov[ing]" CMPC's fabrication claims.  (Dkt. 211 at 9).

The Banks' institutional records are necessary to test that account.  If Mr. Bickel collected agreements as part of a loan underwriting process, the Banks' loan files should independently reflect what was collected, when, and which version of the agreement GWSI provided.  The Banks' communications with Mr. Bickel and Defendants' representatives will reveal whether the documents followed the ordinary course of business or an extraordinary path.  And the Banks' employee separation policies will show whether Mr. Bickel was permitted to retain client documents at his home after leaving the bank or whether he violated his obligations.  Each of these categories bears directly on the reliability of Defendants' latest account.  *See Rehmeyer v*, 2017 WL 4423273, at *2 (discovery rules construed liberally to permit discovery of information relevant to a party's claims or defenses).

The circumstances surrounding the Bickel production independently warrant scrutiny.  Defendants have advanced at least three prior inconsistent explanations for the Alternative

8

Version: that GWSI's "attorney has the original copy" and that was "on vacation" (Ex. A); that Gerace found the agreement "in a filing cabinet in GWSI's offices" (Ex. B at 47-48); and that the agreement was executed in person in Charleston, South Carolina—a claim disproven by travel records within days (Dkt. 94 at 10).  CMPC should not be required to accept this latest account on faith when independent records exist to verify it.  *See KIRA BACCARI*, 2023 WL 12253391, at *1 (upholding third-party bank subpoenas where defendant's own refusal to produce through party discovery supported relevance).

These requested documents and communications are directly probative of the authenticity of the "Alternative Version" of the WSA, and CMPC must be permitted to explore them.

### 2. The Subpoenas Are Narrowly Tailored And Proportional

Defendants characterize the Subpoenas as "vastly overbroad" because certain requests use the phrase "all documents" and contain no temporal limitation.  (Dkt. 199-1 at 6–7).  That characterization ignores the subject-matter constraints that govern every request.  Each request is cabined to documents that "refer or relate to" the parties or the agreements at issue — a standard formulation that ensures responsiveness is limited to the dispute at hand.  Courts regularly sustain subpoenas framed in precisely this way.  *See Wood Grp. USA, Inc. v. RH Energytrans, LLC*, 2022 WL 12066580, at *4–6 (W.D. Pa. July 11, 2022) (denying motions to quash third-party bank subpoenas where requests targeted specific, relevant categories of documents, and production burden was modest relative to tens of millions of dollars in disputed claims).

Defendants also complain that the Subpoenas are duplicative because "the only documents relevant to this action in Mr. Bickel's possession were already produced." (Dkt. 199-1 at 6).  That misses the point.  CMPC does not seek duplicates of documents already produced.  CMPC seeks the Banks' own independent records—loan files, internal communications, separation policies—

that will confirm or refute Defendants' account of how Mr. Bickel came to possess these documents in the first place. Those records have never been produced by anyone.

The subpoenas seek information and documents that are appropriately and proportionately tailored to this dispute in light of Defendants' last-minute disclosure.

### 3. The Information Sought Is Not Confidential Or Protected

Defendants contend that the Subpoenas seek "confidential and protected information." (Dkt. 199-1 at 7). They do not. As explained above, the Subpoenas seek no account balances, transaction records, or financial information of any kind. *See supra* Section A. But even if they did, Pennsylvania does not recognize a privilege for bank records in civil litigation. *See Harrison v. Harrison*, 2020 WL 11334846, at *1 (E.D. Pa. July 8, 2020) ("Pennsylvania jurisprudence does not feature a privilege concerning bank record subpoenas in civil cases . . . a bank could always be compelled to turn over customer's records when served with  . . . a lawful subpoena.").

And confidentiality concerns are at a minimum where the Subpoenas seek discrete categories of information. *See Wood Grp. USA, Inc.* , 2022 WL 12066580, at *4–6 (no confidentiality concerns where subpoenas seeking financial information were targeted and specific in seeking relevant categories of documents); *KIRA BACCARI,* 2023 WL 12253391, at *1 (even where subpoenas sought confidential information they were not inappropriate as discoverable material). To the extent any residual confidentiality concerns exist, they can be readily addressed through the existing Protective Order in this case. *See In re Novartis & Par Antitrust Litig.*, 2019 WL 5722055, at *9-10 (E.D. Pa. Nov. 5, 2019) (rejecting non-party's confidentiality objections where protective order safeguarded competitive interests); *see also Adkins v. Sogliuzzo*, 2011 WL 4345439, at *3 (D.N.J. Sept. 15, 2011) (affirming order that addressed confidentiality concerns over personal financial records by tailoring production scope rather than precluding discovery).

Defendants identify no privilege that applies to the materials sought, and confidentiality alone has never been a basis to quash an otherwise proper subpoena in this Circuit.

        4.      <u>The Balance Of Factors Weighs Heavily Against Quashing The Subpoenas</u>

Defendants' final argument—that the Court should weigh relevance, need, confidentiality, and harm and find the balance favors quashing—inverts the actual equities. *Relevance* is at its apex. Defendants have placed the Bickel documents at the center of their defense, calling them conclusive proof that the Alternative Version was not fabricated. (Dkt. 211 at 9). The Banks' independent records are CMPC's means of testing that claim. *Need* is acute. Defendants disclosed Mr. Bickel on the final day of discovery and now seek to foreclose every avenue of independent verification. Defendants placed these documents at the center of their defense. If Mr. Bickel collected these agreements from Gerace's office as part of a legitimate banking transaction, the Banks' loan files should independently confirm it. Yet rather than welcoming the opportunity to establish that chain of custody, Defendants are actively fighting to suppress the very records that would confirm it. Further, CMPC cannot obtain the Banks' institutional loan files, employee separation records, or internal communications from any other source. The information is uniquely in the Banks' possession. *Confidentiality* is negligible. The Subpoenas seek no financial records, and any sensitivity in the responsive documents can be addressed through the Protective Order already in place. *Harm* falls entirely on CMPC if the Subpoenas are quashed. Defendants will be free to present Mr. Bickel's account at trial as independent corroboration of the Alternative Version while CMPC is denied the records that could expose that account as unreliable—or worse. With trial weeks away, that would cause irreparable prejudice to CMPC's ability to present its case.

<b><u>CONCLUSION</u></b>

CMPC respectfully requests that the Court deny Defendants' Motion.

11

Respectfully submitted this 15th day of April, 2026.

| | |
|---|---|
| **QUINN EMANUEL URQUHART & SULLIVAN, LLP** | **ECKERT SEAMANS CHERIN & MELLOTT, LLC** |

<table>
<tr>
<td>

Juan P. Morillo (*pro hac vice*)
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
juanmorillo@quinnemanuel.com

Samantha Gillespie (*pro hac vice*)
295 Fifth Avenue, 9th Floor
New York, New York 10016
Tel: (212) 849-7000
Fax: (212) 849-7100
samanthagillespie@quinnemanuel.com

Isaac N. Saidel-Goley (*pro hac vice*)
Michelle Z. Wang (*pro hac vice*)
William H. Locke (*pro hac vice*)
Alexandra Schelle (*pro hac vice*)
111 Huntington Ave, Suite 520
Boston, Massachusetts 02199
Tel: (617) 712-7100
Fax: (617) 712-7200
isaacsaidelgoley@quinnemanuel.com
michellewang@quinnemanuel.com
williamlocke@quinnemanuel.com
alexandraschelle@quinnemanuel.com

</td>
<td>

/s/ *Michael J. O'Brien*
Michael J. O'Brien, Esq.
Pa. ID No. 307321
Sarah D. Boutros, Esq.
Pa. ID No. 328888
Two Liberty Place
50 S. 16th St., 22nd Floor Philadelphia,
Pennsylvania 19102
Tel: (215) 851-8400
mobrien@eckertseamans.com
sboutros@eckertseamans.com

**PARKER, HUDSON, RAINER & DOBBS, LLP**

David B. Darden (*pro hac vice*) Georgia
Bar No. 250341
David A. O'Neal (*pro hac vice*) Georgia
Bar No. 342071
Andrew C. Stevens (*pro hac vice*)
Georgia Bar No. 183366
303 Peachtree Street, N.E., Suite 3600
Atlanta, Georgia 30308
Tel: (404) 520-5300
ddarden@phrd.com
doneal@phrd.com
dstevens@phrd.com

*Counsel for CMPC USA, Inc. and
CMPC Celulosa S.A.*

</td>
</tr>
</table>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 15, 2026, a true and correct copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Isaac N. Saidel-Goley*
Isaac N. Saidel-Goley

## CERTIFICATE OF COMPLIANCE WITH STANDING ORDER
## REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order Re: Artificial Intelligence ("AI") in Cases Assigned to Judge Baylson (June 6, 2023), undersigned counsel hereby discloses that artificial intelligence was used in the preparation of this filing. I certify that each and every citation to the law and the record contained herein has been verified as accurate.

*/s/ Isaac N. Saidel-Goley*
Isaac N. Saidel-Goley