**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| CMPC USA, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>GWSI, INC., M. GERACE ENTERPRISES, INC., KEVIN BURKE, in his individual capacity, and MICHAEL GERACE, in his individual capacity,<br><br>*Defendants.* | CIVIL ACTION<br><br>NO. 24-2087 |
| GWSI, INC. and M. GERACE ENTERPRISES, INC.,<br><br>*Counterclaim-Plaintiffs,*<br><br>v.<br><br>CMPC USA, INC., CMPC FOREST PRODUCTS NA, LLC, AND CMPC CELULOSA S.A.,<br><br>*Counterclaim-Defendants* | |

**<u>MEMORANDUM RE: OPEN PRE-TRIAL MOTIONS</u>**

**Baylson, J.**                                                                                                  **April 23, 2026**

Before the Court are several pretrial motions and corresponding briefs filed by both

parties.  They include a Motion to Compel by CMPC (ECF 200, 238, 250), a Motion for Leave

to Disclose an Additional Expert Witness by CMPC (ECF 218, 240, 251), a Motion to Limit

Deposition Duration by GWSI (ECF 222, 235, 247), a Motion to Quash by GWSI (ECF 223,

237, 243), a Motion for Protective Order by GWSI (ECF 224, 236, 249), and a Motion to Quash by non-party Stradley Ronon Stevens & Young (ECF 229, 252).[1]

## I.    BACKGROUND

Several of the motions recently filed concern events that took place during the final weeks of pretrial discovery in this case, leading up to the Court-set deadline of March 31, 2026. These events concern the dispute between the parties as to what agreement governs the rights and obligations between the parties, which has been referred to previously as a Warehouse Service Agreement ("WSA").

The Court is aware that Defendant GWSI asserts that the WSA is not necessarily the governing agreement and refers to other documents that did, in fact, govern the transactions between the parties.  The GWSI Parties take the position that rights and obligations in their relationship with CMPC are governed by "(1) the 2020 Tender and bid process that predates the WSA; (2) the minimum volumes … agreed upon in the 2022 amendment to the WSA; (3) subsequent agreements and amendments among the parties …; and (4) the parties' course of dealing."  ECF 238 at 1.  Nevertheless, the WSA appears to play a central role in determining what binding agreements existed between the parties.

Plaintiff CMPC asserts that the document which it has used for the allegations in this case, dated February 1, 2021 (See Am. Compl. Ex. 1, ECF 40-1), is the authentic WSA document.  Defendant GWSI disputes this and contends that there is a different WSA that controls.

---

[1] Also pending before the Court are a Motion for Sanctions by GWSI (ECF 219, 233, 248) and a Motion to Challenge Improper Assertions of Privilege by GWSI (ECF 225, 232, 246), on which the Court will delay ruling, pending completion of any other pretrial issues.

In the parties' briefing, the WSA document that GWSI asserts is governing is referred to by the parties in different ways, including the "Alternative Version," the "forged version," or the "GWSI WSA."  At this point, the Court takes no position on this issue of what agreement(s) control but concludes that some additional discovery may be necessary because information related to the origin and composition of allegedly controlling versions of the WSA will be relevant and thus discoverable.

CMPC's position is that the GWSI Parties have never been able to provide a consistent explanation for where their version of the WSA came from, who prepared it, or how it was executed.  In February 2024, Defendant Kevin Burke told CMPC via text message that GWSI's "attorney has the original copy" and that the attorney was "on vacation."  ECF 230, Ex. A.[2]  In sworn discovery responses, Defendants represented that Defendant Gerace found the agreement "in a filing cabinet in GWSI's offices in Media, Pennsylvania."  Id. Ex. B at 47–48.  Finally, on March 31, 2026, GWSI Parties disclosed an additional "hard copy" of the GWSI WSA had been found.  ECF 218 at 3–4.  Thus, CMPC suggests GWSI's representations about the location of the original copy of the "GWSI WSA" are unreliable.  Further, CMPC points out, during a Court-ordered meet-and-confer, Defendants' then-law firm Stradley Ronon asserted that the agreement had been executed in person at a meeting between Gerace and CMPC's Joaquin Rojas in Charleston, South Carolina between February 14 and 18, 2021, a claim contradicted by CMPC days later via travel records and passport stamps showing Rojas was in South America during that entire period.  ECF 230 at 3.

The Court recently denied (ECF 253) a motion to quash subpoenas to depose two banks and one individual related to the March 31 disclosure.  It is undisputed that on March 31, 2026,

---

[2] GWSI's attorneys at the time were from the Stradley Ronon Stevens & Young law firm ("Stradley").  Stradley represented the GWSI Parties until recently.

the final day of document discovery, GWSI produced new relevant documents, including a hard-copy version of the disputed WSA that reflects the "GWSI WSA," that had been in the custody of non-party Christopher Bickel, a banker formerly at Centric Bank and currently a Senior Vice President at Customers Bank.[3]  In a sworn declaration, Mr. Bickel states that he took copies of these agreements from Mr. Gerace's office during a 2022 loan underwriting visit and kept them in a manila folder in his home for more than three years after leaving the bank.  He located them after Mr. Gerace personally reached out in 2026 and asked whether Mr. Bickel still had documents from that visit.  ECF 230.  In response to GWSI's March 31 disclosure, CMPC served subpoenas on the two non-party banks where Mr. Bickel was employed, and on Mr. Bickel, requesting all documents involving GWSI and individual defendants.  The Court anticipates that documents produced pursuant to these subpoenas may be relevant.

On reviewing the parties' motions on pending discovery disputes, it appears that there may be valid reasons to bifurcate issues of liability from issues of damages at the trial starting on June 8, 2026.  In addition, it may be appropriate to further bifurcate the issue of what agreement is the governing document, if any, and to get the jury's verdict on that factual question before considering other issues of liability.  If the jury decides neither party has proven its contention by the preponderance of the evidence, this case will have concluded with out any recovery by either party.

---

[3] Mr. Bickel worked for Centric Bank in 2022, where he worked on a loan for GWSI.  Mr. Bickel then joined Customers Bank in 2025.  In 2026, Mr. Gerace (of GWSI) asked Mr. Bickel if he had copies of documents that he obtained when he visited GWSI's offices in 2022 for work related to the loan.  In March 2026, Mr. Bickel searched his home office and found a manila folder labeled "Gerace."   Included in that folder was a document titled "Warehouse Service Agreement" and a document titled "Transportation Services Agreement."  Mr. Bickel thereafter told Mr. Gerace that he located an old file in his office but did not show Mr. Gerace the contents of the file or discuss its contents with him.  Mr. Bickel provided those documents to the GWSI Parties' counsel on March 31, 2026.  The documents were produced to CMPC that day.

The parties have filed multiple motions about how discovery should proceed as it relates to the dispute over the WSA versions. The Court will discuss its conclusions below as to each motion.

## II.    DISCUSSION

### a.    Motion to Compel by CMPC (ECF 200)

CMPC argues that GWSI has failed to produce core categories of documents that CMPC first requested in June 2024 related to what CMPC says is a fabricated version of the WSA. CMPC argues that the Court-ordered depositions conducted in March revealed that GWSI never collected "the printer and scanner used to create the Alternative Version, and the Google activity logs, audit logs, and version histories ("Google Records") that would show who accessed, edited, and shared the WSA in the weeks before the Alternative Version first appeared." ECF 200 at 1. CPMC seeks (1) the Google Records related to the documents, (2) production of the printer and scanner device in Mr. Gerace's office used to scan and submit the WSA, (3) the calendar entries for Mr. Gerace, Mr. Burke, and Mr. Sinatra from January 2024, (4) forensic imaging of Defendants' devices related to a February 2021 email exchange, (5) supplemental written discovery responses, and (6) finalized document production showing GWSI Parties' damages.

#### i.    Google Records

Regarding the Google records, GWSI says it has already complied in producing all metadata related to each "native version" of the GWSI WSA because it produced each separate revision of their WSA that was saved in their Google Drive. GWSI asserts that CMPC has all the metadata necessary to see all individuals that accessed and made changes to these documents, with time stamps. However, the Court agrees with CMPC that Google Records are not clearly

duplicative of meta data contained in discrete document versions.  As CMPC explained, Google

Records include three categories of records:

> "First, <u>activity logs</u> record every user who accessed, viewed, edited, or shared a document, together with the timestamp of each action. *See Drive Log Events, Google Workspace Help*, https://bit.ly/3NMngUj (last visited Apr. 6, 2026). Second, <u>version histories</u> capture sequential iterations of a document as it is modified—and for documents edited natively in Google Docs, the specific text added or removed at each stage.  *See Manage Versions of a File, Google Drive Help*, https://bit.ly/4sizEcC (last visited Apr. 6, 2026); *See, Review, or Restore Earlier Versions of a File, Google Docs Editors Help*, https://bit.ly/4sdVuOF (last visited Apr. 6, 2026). Third, <u>audit logs</u> record user activity across the entire Google Workspace environment, including logins, file operations, and sharing events for all accounts—providing an organization-wide forensic trail that is not limited to any single document. *See Google Workspace Audit Logging, Google Workspace Help*, https://bit.ly/4veDaHM (last visited Apr. 6, 2026).

ECF 200 n. 1.  This information is not clearly duplicative of document-level metadata

and may be relevant information to the dispute over the GWSI WSA's authenticity.  Because it is

neither duplicative or unduly burdensome, Defendants shall collect and produce all Google

Workspace activity logs, version histories, and audit logs for the documents identified in

CMPC's Motion as the "January 2024 Documents."

### ii.   Printer, Scanner, and Calendar Records

CMPC next argues that GWSI should be compelled to collect and produce all data from

the multifunction printing and scanning device in Mr. Gerace's office because CMPC believes

that device was used to create the GWSI version of the WSA on February 20, 2024.  CMPC

argues the printer/scanner data would establish when the GWSI WSA was scanned, on which

specific device, and by whom.

GWSI responds stating they have already produced all the information CMPC seeks.

GWSI says it produced the document that was scanned along with its metadata, and Mr. Gerace

has confirmed that he scanned the document in February 2024 on the multifunction Ricoh printer

in his office.  Further, GWSI says the printer/scanner records no longer exist because Ricoh

printers only maintain print logs for 20 to 40 days. Nevertheless, CMPC seeks forensic imaging of the device as a curative measure for ESI loss.

Additionally, CMPC seeks all calendar entries for Mr. Gerace, Mr. Burke, and Mr. Sinatra so that it can investigate GWSI's claim that its version of the WSA was executed at a meeting in Charleston. GWSI responds that they have already produced all "email-transmitted calendar invitations" related to these individuals and that these individuals do not maintain other records of work meetings, so there is nothing more to produce. CMPC responds that the declarations of Mr. Gerace, Mr. Burke, and Mr. Sinatra are implausible and even if true, a search by Defendants' e-discovery vendor would merely corroborate what they are saying. And if it is wrong, the search may produce a record of whether the Charleston meeting existed or whether the individuals were somewhere else at the time.

Here, it appears the parties have a factual dispute about whether discovery has been turned over or not. The Court is not prepared to immediately disregard Defendants' representations, and if necessary, the Court will allow Plaintiffs to take a 30(b)(6) deposition of all those individuals who were involved in responding to Plaintiffs' request for up to two (2) hours. Defendants, upon request by Plaintiff, shall provide testimony from employees or representatives of the Defendants or of counsel, who were involved in the decisions to request or designate or produce specific documents or information in this case, or about possession of specific documents.

### iii.   Forensic Imaging

CMPC seeks forensic imaging of Defendants' devices because an email attachment has been deleted or otherwise lost from GWSI's records. On February 9, 2021, CMPC and GWSI exchanged an email with an attached version of the WSA. CMPC's position is that the parties

executed the controlling WSA via that email exchange.  Defendants have not been able to produce their copy of the email *with* the attached executed WSA.

GWSI argues forensic imaging of Defendants' devices is not warranted because spoliation did not occur.  A party claiming spoliation of evidence must show that: (1) "certain ESI should have been preserved in anticipation or conduct of litigation;" (2) "the ESI was lost;" (3) "the ESI was lost because the party against which sanctions are sought failed to take reasonable steps to preserve it;" and (4) "the ESI cannot be restored or replaced."  See Petrongola v. Rothman Nat'l Mgmt. Servs. Org., LLC, No. CV 23-734, 2026 WL 684476, at *4 (E.D. Pa. Feb. 6, 2026), R&R adopted sub nom. Mcquilkin v. Rothman Nat'l Mgmt. Servs. Org., LLC, No. CV 23-1049, 2026 WL 678774 (E.D. Pa. Mar. 9, 2026).  Here, GWSI points out that while it produced the disputed email without the attachment, CMPC was able to provide the attachment.  Therefore, GWSI argues spoliation has not occurred because the ESI was not actually lost.

The Court concludes that the totality of the circumstances warrants granting CMPC's Motion with respect to the lost email attachment.  As CMPC points out, there would have been metadata on GWSI's copy of the attachment that includes delivery headers, handling history, and the attachment chain as it arrived on Defendants' servers, all of which does not exist in the metadata of CMPC's attachment.  Accordingly, Rule 37(e)(1) authorizes curative measures, such as forensic imaging, where preservation failed.

#### iv.  Supplemental Discovery Responses

Finally, CMPC seeks supplemental responses to interrogatories and damages production, as well as certification that, following the close of discovery, Defendants will not supplement their discovery responses in such a way that prevents CMPC from having adequate time to

develop expert responses.  GWSI states it has already supplemented their written discovery responses and produced damages documents.  It does not address whether it intends to supplement production further after the close of discovery.

Again, the parties appear to disagree, as a factual matter, about whether discovery has been turned over or not.  The Court is not prepared to immediately disregard Defendants' representations, and if Plaintiff contends it is necessary, the Court will allow Plaintiffs to take a 30(b)(6) deposition of those individuals acting on behalf of Defendants who were involved in responding to Plaintiffs' request for up to two (2) hours.  Defendants, upon request by Plaintiff, shall provide testimony from employees or representatives of the Defendants or of counsel, who were involved in the decisions to request or designate or produce specific documents or information in this case.

**b. Motion for Leave to Disclose an Additional Expert Witness by CMPC (ECF 218)**

CMPC moves for leave to disclose and retain to testify at trial, Jeffrey Luber, a forensic handwriting and document examination expert, to examine the hardcopy versions of the WSA in Defendants' possession.

In connection to the Bickel disclosure, the Court concludes that the request of CMPC to add an expert witness, Mr. Luber, on the authenticity of the documents proffered by GWSI will be granted as this is a major issue in the case, as discussed above.  The Court agrees with CMPC's contentions in these briefs that they did not have sufficient reason to retain such an expert prior to receiving a copy of the allegedly controlling agreement that had been stored by a third party banker and undisclosed for the entire duration of litigation until March 31, 2026.

### c.  Motion to Limit Deposition Duration by GWSI (ECF 222)

The GWSI Parties have moved to limit the "combined" depositions of Rule 30(b)(6) witnesses who are also noticed in their individual capacities to 8 hours.  These individuals are Constanza Arjona, Raimundo Varela, and Alejandra Pavon for the CMPC Parties, and Mr. Gerace, Mr. Burke, and Mr. Sinatra for the GWSI Parties.  ECF 222. at 2.  CMPC argues they agreed to an eight-hour on-the-record cap, but "cannot consent to an absolute cap," in case GWSI attempts to run out the clock, and CMPC asserts that they are entitled to 21 hours under the Federal Rules.

The Court is not inclined to make a ruling based on an assumption either party will engage in bad faith delay tactics during depositions.  The Court will grant the Motion and encourage the parties to remain professional and efficient at depositions.

### d.  Motion to Quash by GWSI (ECF 223) and Motion to Quash by Stradley (ECF 229)

One of the motions related to additional discovery is by the Stradley Ronon law firm ("Stradley") which had been prior counsel to GWSI until the Court allowed it to withdraw (see ECF 114).  At that time, the Court noted that an individual connected to the Stradley firm would likely be a witness in this case.

Plaintiff CMPC may depose individuals from Stradley, seeking facts related to some documents that the Court had previously noted were being reviewed *in camera*.  The GWSI Parties and Stradley have filed motions to quash this subpoena, which the Court will deny.

In the briefing on this issue, the Court agrees with CMPC that the information held by Stradley, whether by a partner or associate or other employee, may be relevant on determining what is the governing document.  The Supreme Court has distinguished "communications,"

which are subject to attorney-client privilege, from the discovery of "facts," which are not subject to any claim of privilege.  Upjohn Co. v. United States, 449 U.S. 383, 395–96 (1981). Communications are protected under the attorney-client privilege when: 1) legal advice of any kind is sought; 2) from a professional legal advisor in his capacity as such; 3) the communications relating to that purpose; 4) made in confidence; 5) by the client; 6) are at his insistence permanently protected; 7) from disclosure by himself or by the legal advisor; 8) except that the protection may be waived.  In re Grand Jury Proceeding Impounded, 241 F.3d 308, 316 n. 6 (3d Cir.2001) (citation omitted).  The attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege."  Fisher v. United States, 425 U.S. 391, 403 (1976) (citation omitted).

In Fisher, the Supreme Court held that a tax document given to attorneys by their client was not protected by attorney-client privilege because it would have been discoverable had it been in the client's possession, and could therefore be subpoenaed from the custody of the attorney. 425 U.S. at 404–05, 409.  The Supreme Court explained that because each client transferred the documents to his attorney to obtain legal assistance, the documents are only unobtainable by summons directed at the attorney if they would be unobtainable by summons directed at the client.  Id. at 405. By the same logic, here, the fact that a version of the WSA was in Stradley's possession at some point is not a communication.

Until CMPC reviews the documents which Stradley must now produce, CMPC may not know for sure whether it desires to have a witness from Stradley testify at the trial.  The order accompanying this Memorandum will give some latitude to CMPC on this issue.

### e.  Motion for Protective Order by GWSI (ECF 224)

This motion is MOOT because CMPC has not exceeded its 10 deposition limit.

III.    CONCLUSION

An appropriate order to follow.

\\adu.dcn\paed\PHL-DATA\Judge_Baylson\CIVIL 24\24-2087 CMPC USA v GWSI\24cv2087 memorandum 04222026 - Madelaine v1.docx